[No. 4317-1. Division One. September 12, 1977.]

ELAINE ZOBRIST, *Individually and as Executrix, Respondent,* v. FRANK CULP, ET AL, *Appellants.*

624

*Lycette, Diamond & Sylvester, Lyle L. Iversen, Howard E. Richmond, Jr., Asmundson, Rhea & Atwood,* and *David E. Rhea,* for appellants.

*Sam Peach,* for respondent.

PER CURIAM.—The defendant–railroaders appeal from a summary judgment quieting title to real property in the plaintiff–landowner. Title was quieted to a portion of the railroad right–of–way of the defendant Cascade Recreation, Inc. (now known as the "Lake Whatcom Railway Company") where it passes through land owned by the plaintiff. The trial court determined that the right–of–way

> is an easement, and has ceased because the defendants have failed to meet the conditions of the original grant requiring the running and operation of a railroad [not cease] for a period of more than twelve consecutive months . . .

The landowner originally filed a complaint in March 1974 in which it was alleged that the defendant–railroad caused a fence separating the plaintiff's property from that owned by the defendant to be destroyed. The fence had been constructed by the plaintiff to be a boundary between her property and the Burlington Northern right–of–way and had been there over 40 years. The complaint asked the court to establish the boundary as the line where the fence existed and to quiet title in the plaintiff to all property lying northerly of the fence. Damages of $500 were also sought for destruction of the fence, and additional damages of $5,000 were asked for alleged harassment. Later, the plaintiff filed an amended complaint alleging that Burlington Northern did not operate a railroad across these tracks for over 2 years prior to the defendants taking over the property; that the defendants used said property as a

tourist facility instead of running and operating a railroad, and that the defendant tore down the plaintiff's fence.

In 1901, R. J. Watson conveyed a 100-foot right-of-way by warranty deed to Bellingham Bay and Eastern Railroad Company over and across the NW 1/4 sec. 26, T. 37 N., R. 4 E.W.M., in Whatcom County, for $100. The deed provided in part:

Said right of way is hereby granted for the purpose of running and operating a Railroad thereover and the said first party reserves the right to free access to pass and repass and go over and return on the said R. R. built and constructed upon the premises aforesaid to and from the lands on each side thereof, except when trains are being operated thereon. Provided always however that if second party shall at any time cease or fail to use the right of way herein mentioned and described for the purpose of running and operating a railroad over the same for the continuous period of 12 consecutive months then and from thenceforth this instrument and the estate hereby granted shall cease and revert to first party.

Early in 1972, the defendant Cascade Recreation, Inc., acquired from the Burlington Northern Railroad title to approximately 5 miles of its branch line of railroad running from Wickersham to Blue Canyon. The Burlington Northern is a successor to the Northern Pacific Railway Company, which for many years had operated a branch line running from Wickersham to Bellingham. The portion of railroad acquired by Cascade Recreation, Inc., was a part of that branch line. The Burlington Northern obtained approval from the Interstate Commerce Commission for the abandonment of the branch line in 1971, and it actually ended service July 1, 1971. Until that date, the Burlington Northern maintained stations at the following locations along the line now owned by defendant: Mirror Lake, Park, Agate Bay and Larson. Those stations were listed in Burlington Northern's official list of open and prepay stations in effect until July 1, 1971, and under applicable federal law, Burlington Northern was obligated to and did

supply rail service at those stations and over the entire branch line until that date.

After July 1, 1971, Burlington Northern continued to operate over the portion of the line acquired by the defendant as late as February 23, 1972, and there was a timetable in effect showing this area as an operating subdivision until July 11, 1972. The track was maintained at all times and not removed. The records of Burlington Northern show that trains for which train orders were issued operated on November 23 and 24, 1971, and December 2, 3 and 13, 1971.

The chief dispatcher for Burlington Northern stated, after examining the records for 1970 and 1971 over the Wickersham to Bellingham route, that there was a train which used the tracks on June 5, 1970, and then no other trains were run over this route until November 23, 1971. The trains that operated in November and December of 1971 were work trains to pick up the tracks from just north of Park to Bellingham. An adjoining property owner had a fence built across the tracks next to the plaintiff's property from May 1971 to May 1972, so that no trains or maintenance equipment could have used the right–of–way during that time.

The defendant Cascade Recreation, Inc., began operating railroad equipment over the line in May of 1972 and has operated continuously since. As late as March of 1972, Burlington Northern freight cars stood on a siding in section 26 in the area of plaintiff's property. The defendants now operate trains pulled by a steam locomotive, and passengers ride in regular railroad coaches formerly operated on the Burlington Northern. The operation is for public use and the conveyance of persons and property for hire. On summer weekends trains are run on a regular schedule and at other times when business warrants. The defendants maintain a ticket office at Park, Washington, and service is available from Burlington Northern which can provide direct connection with its existing trackage. The defendants

state that their railroad is over 4 miles long and only about 400 feet of it passes through the plaintiff's property.

The plaintiff asserts that the defendant's rail line extends from Wickersham 3 1/2 miles westerly to Park and then 1/4 mile northerly to Blue Canyon City, and that it dead–ends at each end and there is no connection with any other railroad. They assert it is a recreational, sightseeing railroad that carries sightseers on summer weekends and no freight, and does not interconnect with anything. They said that the Wickersham station closed in 1958, and there have been no buildings or stations or ticket agents at Park, Mirror Lake, Agate Bay or Larson for over 20 years.

The motion was not argued on a stipulation that the matter could be decided on summary judgment. The record does not support that conclusion. The affidavits do not relate to the circumstances or inducements under which the original deed of property was given to Bellingham Bay and Eastern Railway Company, and there is no showing as to the motives of the parties to that transaction. There is no evidence in the record that the line is now operated as an excursion railroad for sightseeing and entertainment. The defendants assert that the record contains no evidence of the intention of the original grantor, but that historical records show that the Bellingham Bay and Eastern Railroad Company in 1901 was a local logging road not connected with any interstate carrier, and that it was built to serve the Blue Canyon Mine. The defendants state that the historical records also show that the Bellingham Bay and Eastern at the time of the original deed was dead–ended short of Wickersham and connected to a streetcar line at Fairhaven, and that there is no inference from any of the circumstances of the original purchase that the operation of the railroad had to be connected to an interstate carrier. The defendants submit that there is now a permanent connection at Wickersham and that the railroad is used for hauling logs over its tracks for delivery to the Burlington Northern, and that the forfeiture which the plaintiff seeks

would ruin the railroad by blocking passage in the middle of the line.

We will identify the defendant railroad operators as the "railroaders" and the plaintiff landowner as the "landowner" hereafter for ease of identification.

*What are the property rights of the parties?*

The railroaders assert that (a) the landowner never acquired any property rights in the 100–foot right–of–way conveyed to the railroad, and (b) Watson, the original grantor, conveyed more than a mere easement to the railroad. The basis stated for this argument is that by "excepting" the 100–foot right–of–way from the conveyance to Custer, instead of conveying the land "subject to" the right–of–way, the original grantor, Watson, never conveyed the fee to the land within the railroad right–of–way; and the conveyances to the railroad from Watson and to Custer from Watson specified the exact boundaries of the railroad right–of–way, thereby raising it to a more substantial property right than an easement.

■■ The instruments of conveyance should reflect the intention of the parties. *Gold Bar v. Gold Bar Lumber Co.,* 109 Wash. 391, 393–94, 186 P. 896 (1920), held:

> [T]he intent of the parties must primarily be gathered from a fair consideration of the deed, and the language employed therein should be consistent with the terms of the deed, including its scope and subject–matter; that the object, in construing the deed, is to ascertain the intention of the parties, especially that of the grantor; that some meaning should be given to every word, clause and expression, if it can reasonably be done and if it is not inconsistent with the general intent of the whole instrument, so that the deed may operate according to the intention of the parties; . . .

In 6 G. Thompson, *Commentaries on the Modern Law of Real Property* § 3090, at 773 (repl. ed. 1962), it is stated:

> An exception is the withholding from the operation of the deed of something existent which otherwise the deed would pass to the grantee.

*Accord, Duus v. Ephrata,* 14 Wn.2d 426, 430, 128 P.2d 510, 134 P.2d 722 (1942). The conveyance of a fee simple interest with a clause excepting an easement previously deeded to a third party, therefore, conveys to the grantee all the grantor's rights and interests in the land, yet compels the grantee to refrain from acting in a manner inconsistent with the rights of the third party in the land as described in the exception.

■ The landowner asserts the grantor, Watson, excepted a right–of–way from her conveyance to Custer in plain language. Watson, by this conveyance, granted her 200 acres to Custer and then added "except the right–of–way one hundred (100) feet wide through above described property deeded to the Bellingham Bay & Eastern Railroad Company . . ." This "right–of–way" is the same term used in the conveyance to the railroad. That deed read in part:

> Grant Bargain Sell Convey and Confirm the free and uninterrupted use of for and in a right of way . . . The right of way herein designated being 50 feet on each side . . . Said right of way is hereby granted for the purpose of running and operating a Railroad . . .

No reference was made in the deed to the railroad of a grant of the fee. As stated in *Swan v. O'Leary,* 37 Wn.2d 533, 537, 225 P.2d 199 (1950):

> [W]e adopted the rule that when the granting clause of a a deed declares the purpose of the grant to be a right of way for a railroad the deed passes an easement only, and not a fee with a restricted use, even though the deed is in the usual form to convey a fee title.

*Accord, El Dorado & Wesson Ry. v. Smith,* 233 Ark. 298, 344 S.W.2d 343, 344 (1961); *Glendora v. Faus,* 148 Cal. App. 2d 920, 307 P.2d 976, 980 (1957); *Askew v. Spence,* 210 Ga. 279, 79 S.E.2d 531, 532 (1954); *Ross, Inc. v. Legler,* 245 Ind. 655, 199 N.E.2d 346, 348 (1964); *Maryland & P.R.R. v. Mercantile–Safe Deposit & Trust Co.,* 224 Md. 34, 166 A.2d 247, 248–49, 95 A.L.R.2d 463 (1960); *Bode v. Flobert Indus., Inc.,* 197 Neb. 488, 249 N.W.2d 750, 753 (1977); *City Motel, Inc. v. State ex rel. Dep't of Highways,*

75 Nev. 137, 336 P.2d 375, 377 (1959); *Fleck v. Universal–Cyclops Steel Corp.,* 397 Pa. 648, 156 A.2d 832, 834–35 (1959); *Rio Bravo Oil Co. v. Hunt Petroleum Corp.,* 439 S.W.2d 853, 859 (Tex. Civ. App. 1969), *rev'd on other grounds,* 455 S.W.2d 722 (Tex. 1970); Annot., 6 A.L.R.3d 973, 1013 (1966); 65 Am. Jur. 2d *Railroads* §§ 73, 75, 77 (1972). The fact that the exact boundaries of the right–of–way were set out does not outweigh the express intent of the grantor to convey only a right to use the land, not the land itself.

The subject matter of both the deed to the railroad and the exception in the conveyance to Custer is described as a "right–of–way one hundred (100) feet wide." It has been stated:

> To except certain property from a lease or deed of conveyance, which otherwise would carry all the land, words of exception must be as definite as those required to convey title and if not so the whole property passes.

6 G. Thompson, *Commentaries on the Modern Law of Real Property* § 3092, at 796 (repl. ed. 1962). The grantor here excepted a right–of–way amounting to an easement from the grant. No reference was made in the conveyance to Custer of an exception of the fee to the 100 feet. The railroad received an easement from Watson and nothing more. The landowner's predecessor in interest, Custer, on the other hand, received a fee interest in the land and could use it in any way he saw fit, restricted only in that he could not use the 100–foot wide strip in a manner inconsistent with the existing rights of the railroad to pass over it.

*Scott v. Wallitner,* 49 Wn.2d 161, 299 P.2d 204 (1956), does not stand for the proposition that Watson, by excepting the right–of–way from the deed to Custer, never conveyed the fee to the land within the right–of–way. In *Scott v. Wallitner, supra* at 164, the court explicitly recognized:

> It will be noticed that in none of these transactions was there a grant of a right of way for the purpose of building a railroad thereon. Here the Ebey Logging Company purchased several tracts of land. As a part of

its operations, it built and operated a logging railroad thereon. It carved the right of way out of its own lands.

*Mouat v. Seattle, Lake Shore & E. Ry.,* 16 Wash. 84, 85, 47 P. 233 (1896), also cited by the railroaders, dealt with a deed that did not contain a condition that if the land should cease to be used for railroad purposes for any particular length of time it would revert to the underlying ownership. The case before us, contrary to both the *Scott* and *Mouat* decisions, involved both a grant of a right-of-way for the purpose of building a railroad, and a specific limitation on that grant, that if at any time the railroad should "cease or fail to use the right of way . . . for the purpose of running and operating a railroad . . . for the continuous period of 12 consecutive months . . . the estate thereby granted shall cease and revert to the first party."

> *What does "running and operating a railroad" entail?*

The landowner advocates a narrow definition of "running and operating a railroad." She asserts that in order to fit within the "running and operating a railroad" language of the deed, trains must be run over the property in question, and that neither the appearance or intent to operate, the occasional storage of cars on the right-of-way, nor operating on other parts of the same rail system will be sufficient to amount to "operating" a railroad over the right-of-way in question if no trains are run over it. A number of courts have interpreted similar clauses this narrowly. *See Gill v. Chicago & N.W. Ry.,* 117 Iowa 278, 90 N.W. 606 (1902); *Hickox v. Chicago & C.S. Ry.,* 94 Mich. 237, 53 N.W. 1105 (1892); *Seventy-Ninth St. Improvement Corp. v. Ashley,* 509 S.W.2d 121, 123 (Mo. 1974); *Schuermann Enterprises, Inc. v. St. Louis County,* 436 S.W.2d 666, 668 (Mo. 1969).

The railroaders assert, on the other hand, that the "running and operating a railroad" limitation in the deed merely sets out a requirement that the railroad may not intend to abandon the right-of-way and yet still retain it.

Faced with a question of liability of a railroad for killing livestock, the court in *Chicago, K. & W. Ry. v. Totten,* 1 Kan. App. 558, 567, 42 P. 269, 272 (1895), defined "operating" a railroad as follows:

> Now, operating means acting, exerting some agency or power; and while the term "operating," when used with respect to a railroad, may have come to possess a distinctive meaning, yet it would seem that a fair construction of the statute would be that whenever a railroad company runs its engines and cars upon its line of road, it is operating it. If it uses it for purposes of general traffic, then it may be said to be in full operation; and if, when part of the road is built, trains are being run over that portion of the road conveying material for the extension of the line, still it may very consistently be said that the portion of the line built is being operated for construction purposes. In either event the company would be operating its road.

Other courts, faced with the question as to whether a railroad is "operating" on or has abandoned a right–of–way, have adopted an activity–oriented definition of "operating" similar to that in the *Totten* case. Under this definition a failure to actively operate can amount to nonuse and abandonment of a right–of–way if the granting instrument or an applicable statute so provides. In *Atlantic Coast Line R.R. v. Sweat,* 177 Ga. 698, 699, 171 S.E. 123, 129 (1933), the conveyance to the railroad read:

> to have and to hold to said railroad company so long as they, their successors and assigns, shall maintain and use said road; but to revert to the said party of the first part whenever said road shall be abandoned."

The railroad argued that nonuse of its right–of–way did not constitute abandonment. The court disagreed and stated at page 710:

> Upon a construction of the whole instrument with a view of ascertaining the intention of the parties, a failure to "maintain and use said road" as above defined would constitute an abandonment within the purview and meaning of the particular agreement. While nonuser alone will not ordinarily constitute an abandonment, the

parties to the grant here under construction virtually contracted that a nonuser would amount to such. . . . The language above quoted was the equivalent of a statement that the grantees and its successors would have the right to use the strip of land for a right of way so long as "they maintained and used said road," but no longer. The agreement thus created a conditional limitation the expiration of which would ipso facto terminate the estate. . . . After the happening of such event, a new occupancy by the grantee, or a successor, would not reinvest the occupant with title.

(Citations omitted.)

In *McClain v. Chicago, R.I. & P. Ry.*, 90 Iowa 646, 57 N.W. 594 (1894), the court pointed out that the existence of a statute providing for reversion to the grantor if a right–of–way granted to a railroad was not used or operated for a period of 8 years established a different test for abandonment than if no statute existed. It held:

Without the statute, to constitute abandonment there must have been a permanent cessation to use; that is, a cessation to use, with an intent not to resume the use. Under the statute, mere nonuser for eight years constitutes abandonment, regardless of the intention of the company.

*McClain v. Chicago R.I. & P. Ry., supra* at 648.

The term "running and operating a railroad" in the Watson deed must be interpreted in conjunction with the circumstances before us. The limiting language of the deed states:

Provided always however that if second party shall at any time cease or fail to use the right of way herein mentioned and described for the purpose of running and operating a railroad over the same for the continuous period of 12 consecutive months . . . the estate hereby granted shall cease and revert to first party.

The presence in the deed of this explicit limiting language takes this case out of the line of abandonment cases the railroader has cited as authority that contain no such language in their granting provisions. Had the Watson grant been for a right–of–way and limited to "railroad purposes"

with no other stipulation as to any specific kind or frequency of activity, the test for abandonment would have been more stringent. *See generally* Annot., 95 A.L.R.2d 468, 471–79 (1964). In the present case, by stating "if second party shall at any time cease or fail to use the right of way . . . for the purpose of running and operating a railroad over the same for the continuous period of 12 consecutive months," the grantor Watson set out exactly what would amount to abandonment. *See Gill v. Chicago & N.W. Ry., supra.*

We agree with the landowner that where conditional language used by parties to a right–of–way conveyance clearly evidences their mutual intention that the grantee–railroad actively utilize the privilege granted it in the easement, sham activity performed for the sole purpose of creating a colorable use cannot be said to fit within legitimate railway purposes contemplated by the original grantor and grantee of the easement. *Gill v. Chicago & N.W. Ry., supra.* The parties to the Watson deed, however, did not limit their definition of actively "running and operating a railroad" solely to the physical passage of trains over the property, nor did they put any limitations on how the railroad using the right–of–way must operate. The only limitation placed in the deed is that the grantee must not "at any time cease or fail to use the right of way . . . for the purpose of running and operating a railroad over the same for the continuous period of 12 consecutive months."

The deed does not contain a limitation on the type of railroad to be operated over the right–of–way, or the extent of what could be considered to be railroad purposes. We will not speculate upon the meaning of the deed where the deed is silent on a particular subject. *See Vavrek v. Parks,* 6 Wn. App. 684, 690, 495 P.2d 1051 (1972). We agree with the statement found in *Mitchell v. Illinois Cent. R.R.,* 384 Ill. 258, 264, 51 N.E.2d 271, 274, 149 A.L.R. 369 (1943), as follows:

> Railroad purposes include such a variety of uses as changes in circumstances may bring about, depending

upon the facts in each case. The use, if reasonably necessary, is generally sustained.

We hold that to run and operate a railroad in accordance with the terms of the deed granting a right-of-way easement for railroad purposes and avoid a nonuse stipulation, a railroad must actively pursue some legitimate course of action which directly or indirectly contributes to the safe, economical and efficient operation of its road. *Mitchell v. Illinois Cent. R.R., supra; McSweyn v. Inter-Urban Ry.,* 256 Iowa 1140, 130 N.W.2d 445, 448 (1964). *See also Behlow v. Southern Pac. R.R.,* 130 Cal. 16, 62 P. 295, 296 (1900) (sporadic operation of gravel trains replacing the regular operation of a passenger train was sufficient to satisfy the "railroad purposes" condition of the grant); *Tompkins v. Atlantic Coast Line R.R.,* 213 Ga. 48, 96 S.E.2d 603, 605 (1957) (use of the easement as a side track to discharge and receive freight and not as a main line still satisfied the railroad purposes requirement for the easement); *Anderson v. Interstate Mfg. Co.,* 152 Iowa 455, 132 N.W. 812, 813 (1911) (use of the easement for a warehouse to facilitate shipments on the railroad was not misuse of the easement); *Rombauer v. St. Louis-San Francisco Ry.,* 225 Mo. App. 78, 34 S.W.2d 155, 156-57 (1931) (use of the right-of-way for construction of bunkhouses for maintenance crews fell within the railroad's operating purposes); *Hodges v. Atlantic Coast Line R.R.,* 196 N.C. 66, 144 S.E. 528, 529, 59 A.L.R. 1284 (1928) (construction of houses for maintenance crews on the easement was necessary to the operation of the railroad's business); 65 Am. Jur. 2d *Railroads* § 108 (1972). The railroaders' current operation of a full sized engine and passenger cars fits this definition. The question as to whether some railroad purpose was served at least once every 12-month period, including the period prior to defendant's initiation of his present operation, raises an additional issue.

*Does a genuine issue of material fact exist as to whether the railroaders or their predecessors failed to*

636

*operate a railroad over the right–of–way in question for a continuous period of 12 consecutive months?*

The railroaders assert there was no failure to actively operate a railroad over the right–of–way in question for a continuous period of 12 months, and that therefore the granting of a summary judgment was improper. This assertion is based on the following propositions:

1. Burlington Northern published tariffs and maintained four stations along the Bellingham–Wickersham route until July 1, 1971, and was not required to have buildings or agents permanently assigned to any of those four stations;

2. Burlington Northern published a timetable in November 1971 showing this line to be an operating subdivision, and this timetable was not superseded until July 1972;

3. Burlington Northern at all times until its official abandonment of the line in 1971 (a) was obligated under federal law to provide rail service, (b) held itself out as being available for such service, (c) never used the right–of–way in any manner inconsistent with its continued existence;

4. No 12–month lapse occurred between July 1971 when the I.C.C. allowed Burlington Northern to abandon the line and the railroaders' initial opening of operations in May 1972;

5. Burlington Northern's records show that trains for which train orders were issued operated in November and December of 1971 on the right–of–way in question;

6. Burlington Northern had freight cars on a siding in the area of plaintiff's property as late as March 1972;

7. The railroaders began operating the Lake Whatcom railroad, consisting of a full sized engine and passenger cars, in May 1972 and continue to so operate the railroad;

8. The railroaders' train runs on a regular schedule on weekends in the summer;

9. The railroaders' current recreational railroad is a common carrier;

10. The operation of the railroad falls within the definition of operating a railroad (a) as used by the Washington

Public Service Commission, and (b) as defined under the Federal Railroad Safety Act of 1970;

11. The railroader could get service from Burlington Northern if it was applied for.

12. The railroaders can directly connect with existing trackage and will accept shipments from the public if asked.

13. The landowner failed to present evidence showing that motor cars, high–rail trucks or other rail equipment used in track or communication maintenance did not "operate" over the line in question every 12 months;

14. Other Burlington Northern employees might contradict evidence in the landowner's affidavits; and

15. The track over the property in question was maintained at all times.

■■ The purpose of a motion for summary judgment pursuant to CR 56 is to examine the sufficiency of the evidence behind the plaintiff's formal allegations in the hope of avoiding unnecessary trials where no genuine issue as to a material fact exists. *Morris v. McNicol,* 83 Wn.2d 491, 519 P.2d 7 (1974); *Barovic v. Cochran Elec. Co.,* 11 Wn. App. 563, 524 P.2d 261 (1974). A material fact is one upon which the outcome of the litigation depends in whole or in part. *Morris v. McNicol, supra; Amant v. Pacific Power & Light Co.,* 10 Wn. App. 785, 520 P.2d 181 (1974). The motion will be granted only if after viewing all the pleadings, affidavits, depositions, admissions and all reasonable inferences drawn therefrom in favor of the nonmoving party, a trial court decided (1) that there is no genuine issue as to any material fact, (2) that all reasonable persons could reach only one conclusion, and (3) that the moving party is entitled to judgment as a matter of law. *LaPlante v. State,* 85 Wn.2d 154, 531 P.2d 299 (1975); *Wilber Dev. Corp. v. Les Rowland Constr., Inc.,* 83 Wn.2d 871, 523 P.2d 186 (1974); *McDonald v. Murray,* 83 Wn.2d 17, 515 P.2d 151 (1973); *Ciminski v. Finn Corp.,* 13 Wn. App. 815, 537 P.2d 850 (1975). A nonmoving party attempting to preclude a summary judgment may not rely on speculation, argumentative

assertions that unresolved factual matters remain, or in having its affidavits considered at their face value, for upon the submission by the moving party of adequate affidavits the nonmoving party must set forth specific facts that sufficiently rebut the moving party's contentions and disclose that a genuine issue as to a material fact exists. *American Linen Supply Co. v. Nursing Home Bldg. Corp.*, 15 Wn. App. 757, 551 P.2d 1038 (1976); *Ashwell–Twist Co. v. Burke*, 13 Wn. App. 641, 536 P.2d 686 (1975); *Bates v. Grace United Methodist Church*, 12 Wn. App. 111, 529 P.2d 466 (1974); *Blakely v. Housing Auth.*, 8 Wn. App. 204, 505 P.2d 151 (1973).

 The landowner presented affidavits in support of the motion for summary judgment showing that

> Burlington Northern operated one or more trains over said Wickersham to Bellingham route each day Jan. 1st thru Mar. 16, 1970 and on June 4th and 5th of 1970 and on November 23rd, 24th, 1971, and December 2nd, 3rd and 13th, 1971, and at no other times according to the records of Burlington Northern Railroad. That said records ordinarily reflect the operation of trains over the track involved and no other track usage by trains is indicated from the operating records . . .

The fact that the landowner did not show that motor cars, high–rail trucks or other rail equipment used in track or communication maintenance did not operate over the line every 12 months will not defeat the motion for summary judgment, for the railroaders did not set forth specific factual allegations showing such vehicular activity actually did take place as required by CR 56. Similarly, the fact that (1) Burlington Northern held itself out to be "operating" on the right–of–way, (2) that the railroaders could get service from Burlington Northern if it was wanted, or (3) that Burlington Northern's and the railroaders' activities were regulated by the I.C.C., Washington Public Service Commission, or provisions in the Federal Railroad Safety Act of 1970, is not dispositive, for these activities do not amount to an active continuous yearly operation as a

matter of law. *Cf. Gill v. Chicago & N.W. Ry.,* 117 Iowa 278, 90 N.W. 606 (1902).

Evidence was presented that trains operated over the right-of-way in November 1971, December 1971, and February 1972 following the abandonment of the track pursuant to an I.C.C. authorization in July 1971. The crucial 12–month period covers not only the time following the I.C.C. abandonment ruling, but also any previous period. The landowner has offered uncontroverted evidence of a period of nonuse by trains of over 17 months. While not controverting this evidence, the railroaders depend upon Burlington Northern's obligation to run its trains over this route until officially relieved of the responsibility as amounting to "operating a railroad." The I.C.C. may have a complaint against Burlington Northern for derogation of its responsibilities, but this will not shield the Burlington Northern's 17–month period of inactivity from amounting to a violation of the limitations in the deed. *See Seventy-Ninth St. Improvement Corp. v. Ashley,* 509 S.W.2d 121, 123 (Mo. 1974).

██ The railroaders did not rebut specifically the contentions that no trains were run over the right-of-way, but they did present evidence that the line and stations along it had been maintained throughout the period in question. This raises an inference that the track was "used" in that it was operable during the June 1970 through November 1971 period in question. Keeping its roadbed and tracks in good repair is a duty of the railroad, *Earley v. Hall,* 89 Conn. 606, 95 A. 2, 4 (1915); *Hodges v. Atlantic Coast Line R.R.,* 196 N.C. 66, 144 S.E. 528, 529, 59 A.L.R. 1284 (1928), and directly "contributes to the safe, economical and efficient operation of its road." The fact that the landowner offered evidence which, if believed, would show that (1) the track had not been maintained, (2) a fence was built across the track immediately to the east of plaintiff's property in May 1970 and was left undisturbed for over a year, and (3) that a slide occurred covering the tracks and was not removed during the period in question, will not detract from the

inference raised which creates a material issue of fact. The railroaders, as the nonmoving party, are entitled to have all reasonable inferences drawn in their favor. CR 56.

The existence of a genuine issue of material fact on the question of whether the railroaders or their predecessor in interest, Burlington Northern, ceased or failed to use the track across the property in question for railroad purposes during the June 5, 1970, to November 23, 1971, period, requires the cause to be remanded for trial.