2011 WY 29

**DAVIDSON LAND COMPANY, LLC, Appellant (Plaintiff),**

v.

**Suellen L. DAVIDSON, Charles Noller Davidson, and Deborah J. Davidson, Appellees (Defendants).**

No. S–10–0060.

Supreme Court of Wyoming.

Feb. 18, 2011.

provided in their agreement that if the right of way were ever abandoned, they would execute any necessary documents to vest the other with full title in the right of way over his respective portion of ranch. Later, Daniel purchased a quitclaim deed to the right of way from the Union Pacific Railroad Company (UPRR), and his successors refuse to execute documents to fully vest Chester's successors with title to the right of way over Chester's portion of the ranch.

[¶ 2] The district court granted summary judgment and quieted title in property covered by the railroad right of way to Daniel's successors on the basis of the quitclaim deed. Chester's successors claim the district court incorrectly interpreted the terms of the parties' agreement. We conclude, as a matter of law, the district court's interpretation of the agreement was incorrect. The unambiguous contractual language requires Daniel's successors to convey whatever interest they received from UPRR in the right of way over Chester's land to his successors.

[¶ 3] We reverse and remand.

Representing Appellant: C.M. Aron of Aron and Hennig, LLP, Laramie Wyoming.

Representing Appellees Suellen L. Davidson and Charles Noller Davidson: Alexander K. Davison of Patton & Davison, Cheyenne, Wyoming.

Representing Appellee Deborah J. Davidson: Greg Weisz and Megan Overmann Goetz of Pence & MacMillan, LLC, Laramie, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

KITE, Chief Justice.

[¶ 1] Two brothers, Daniel Davidson and Chester Davidson, agreed to partition their ranch in 1982.[1] In recognition of a railroad right of way that traversed the ranch, they

## ISSUES

[¶ 4] Chester's successors state the issues on appeal as follows:

ISSUE I: Whether the District Court misconstrued the parties' contractual intent.

ISSUE II: Whether the doctrine of Estoppel by Deed precludes appellees' claim of ownership by their after-acquired title.

ISSUE III: Whether title to real property can be quieted in a grantee, *sua sponte*, based only on a quitclaim deed, without evidence that the grantor owned a fee interest to convey.

Daniel's successors phrase the issue differently:

Che[ster] and Dan[iel] Davidson owned a ranch with a railroad-owned right-of-way through it. By agreement, they divided the ranch in 1982, exchanging warranty deeds. Each would receive the right-of-

---

1. The parties in this case are successors in interest to Daniel and his wife Earlene and Chester and his wife Norma. At the time of this proceeding, Chester's interest was owned by Appellant Davidson Land Company, LLC, and Daniel's interest was owned by Appellees Suellen, Charles and Deborah Davidson. For the sake of clarity, we will refer to the parties as "Daniel's successors" and "Chester's successors."

way through his property if it was ever abandoned. In 1996 Dan[iel] bought the entire right-of-way from UPRR. Are Dan[iel]'s successors now required to transfer any of the right-of-way to Appellant under the terms of the agreement or warranty deed?

## FACTS

[¶ 5] Daniel and Chester Davidson, together with their wives, owned a 160 acre ranch, containing nine separate parcels, near Saratoga, in Carbon County, Wyoming. A railroad traversed the ranch from the northwest to the southeast. Around 1979, the tracks, bridges and abutments were removed by UPRR.

[¶ 6] In 1982, the two Davidson couples entered into an agreement to partition the ranch by cross-conveying the parcels, with Chester and his wife Norma receiving parcels one through five and Daniel and his wife Earlene receiving parcels six through nine (1982 Agreement). The railroad had been located on parcels three and four on Chester's land and parcels seven and eight on Daniel's land. Title to the lands affected by the railroad in parcels three and four is at issue here.

[¶ 7] Paragraph 6 of the 1982 Agreement addressed the interests the respective Davidsons owned in the railroad right of way, as follows:

Parcels 3 and 4 contain a railroad right-of-way containing 2.78 acres, more or less. The parties agree that the land within said right-of-way is the property of Chester C. Davidson and Norma Davidson and that if the right-of-way is ever abandoned, Daniel Davidson and Earlene Davidson agree to execute such instruments of conveyance as may be required to vest said land in Chester C. Davidson and Norma Davidson. Parcels 7 and 8 likewise contain a railroad right-of-way which the parties agree is the property of Daniel Davidson and Earlene Davidson and Chester C. Davidson and Norma Davidson agree to execute such instruments of conveyance as may be re-

quired to vest said land in Daniel Davidson and Earlene Davidson if the right-of-way is ever abandoned.

[¶ 8] At the same time they entered into the 1982 Agreement, the parties executed reciprocal warranty deeds conveying the properties in accordance with the agreement. There is no showing in the record that the land subject to the right of way was excluded from the property description contained in each deed. The property descriptions were followed by the language:

SUBJECT, HOWEVER, to all easements, reservations, restrictions and rights-of-way of record in the office of the County Clerk and Ex–Officio Register of Deeds for Carbon County, Wyoming.

Daniel subsequently conveyed his interest to Earlene as part of their estate plan.

[¶ 9] Twelve years after the ranch was partitioned, Daniel met with a UPRR representative concerning the right of way. He stated that the representative wanted to sell the right of way to "interested persons," but would not divide the right of way into two parts to accommodate Daniel's and Chester's partition of the property. In 1996, after Daniel paid $6,900, UPRR executed a quitclaim deed to the entire right of way across parcels three, four, seven and eight to Daniel's wife, Earlene. Daniel averred that he purchased the right of way "with the thought that [Chester] would purchase his share of it," but Chester never paid for his portion.

[¶ 10] Over the years, the properties were passed down to family members. In August 2009, Chester's successors filed a complaint against Daniel's successors seeking specific performance of the 1982 Agreement. Chester's successors also requested a declaration that they owned the land formerly subject to the railroad right of way in parcels three and four. Daniel's successors generally denied the allegations and counterclaimed to have title to the right of way land quieted in them on the basis of the quitclaim deed they received from UPRR.[2]

---

2. In the district court, Suellen and Charles Davidson appeared together, while Deborah Davidson was separately represented. Although there were minor differences in their positions, they are not relevant here. Suellen and Charles filed a brief on appeal, but Deborah did not.

[¶ 11] Both sides moved for summary judgment on Chester's successors' claims. After a hearing, the district court granted summary judgment in favor of Daniel's successors and quieted title to the property in them. Chester's successors appealed.[3]

## STANDARD OF REVIEW

[¶ 12] Summary judgments are governed by W.R.C.P. 56(c):

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

We review a summary judgment *de novo*, using the same materials and following the same standards as the district court. "We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record." *Hasvold v. Park County School Dist. No. 6*, 2002 WY 65, ¶ 11, 45 P.3d 635, 637–38 (Wyo.2002), quoting *Four Nines Gold, Inc. v. 71 Constr., Inc.*, 809 P.2d 236, 238 (Wyo.1991). *See also, Alpine Lumber Co. v. Capital West Nat'l Bank*, 2010 WY 62, ¶ 5, 231 P.3d 869, 870–71 (Wyo.2010).

[¶ 13] In cases involving questions of contract interpretation, we apply the following standard of review:

The initial question of whether the contract is capable of being understood in only one way is a question of law for the court. If the court determines that the contract is capable of being understood in only one way, then the language used in the contract expresses and controls the intent of the parties. In such case, the next question, what is that understanding or meaning, is also a question of law. When we

review the district court's summary judgment decisions that a contract is capable of being understood in only one way and what that understanding is, we accord no deference to those decisions.

*M & M Auto Outlet v. Hill Inv. Corp.*, 2010 WY 56, ¶ 12, 230 P.3d 1099, 1104 (Wyo.2010), quoting *Examination Mgmt. Servs., Inc. v. Kirschbaum*, 927 P.2d 686, 689 (Wyo.1996) (internal citations omitted).

## DISCUSSION

[¶ 14] This case requires interpretation of the 1982 Agreement, the corresponding warranty deeds and the UPRR quitclaim deed. Each of these documents is a contract and must be interpreted using our standard contract interpretation principles. *Ecosystem Res., L.C. v. Broadbent Land & Res., L.L.C.*, 2007 WY 87, ¶¶ 9–10, 158 P.3d 685, 688 (Wyo.2007); *R.C.R., Inc. v. Rainbow Canyon, Inc.*, 978 P.2d 581, 586 (Wyo.1999).

In considering the meaning of a contract, we focus on the parties' intent. If possible, we determine their intent from the language used in the agreement. Where the language is clear and unambiguous, we limit our inquiry to the four corners of the document, giving the words contained therein their ordinary meaning. The parties are free to incorporate within their agreement whatever lawful terms they desire, and we are not at liberty, under the guise of judicial construction, to rewrite the agreement. It is only when a contract is ambiguous that we construe the document by resorting to rules of construction. A contract is ambiguous if indefiniteness of expression or double meaning obscures the parties' intent.

*Christensen v. Christensen*, 2008 WY 10, ¶ 13, 176 P.3d 626, 629 (Wyo.2008), citing *Cathcart v. State Farm Mut. Auto. Ins. Co.*, 2005 WY 154, ¶ 18, 123 P.3d 579, 587 (Wyo.

---

**3.** At oral argument on September 22, 2010, vague reference was made to a federal court proceeding involving these parties and the railroad. On January 5, 2011, Daniel's successors filed a "Notice of Submittal of Additional Authority," which included a copy of a summary judgment order from the federal district court. Chester's successors had apparently brought an

action against UPRR and Daniel's successor's seeking a declaration that UPRR had abandoned the railroad prior to 1996. The federal district court entered judgment in favor of UPRR and Daniel's successors, ruling Chester's successor's action was barred by res judicata. The federal court action has no bearing on our decision.

2005). *See also, M & M,* ¶ 15, 230 P.3d at 1105. While we do not consider parol evidence when interpreting unambiguous contracts, it is well settled that even if a contract is unambiguous we can examine evidence of the circumstances surrounding its execution to determine the parties' intent. "Relevant considerations may include the relationship of the parties, the subject matter of the contract, and the parties' purpose in making the contract." *Ecosystem,* ¶ 10, 158 P.3d at 688. In addition, documents executed as part of the same transaction should be considered together and consistently. *See, e.g., Houghton v. Thompson,* 57 Wyo. 196, 206, 115 P.2d 654, 657 (Wyo.1941); 11 Williston on Contracts § 30:26 (2010), stating "in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument . . . ." (footnotes omitted).

[¶ 15] For convenience, we will restate the relevant provisions of the documents at issue. The 1982 Agreement stated:

> Parcels 3 and 4 contain a railroad right-of-way containing 2.78 acres, more or less. The parties agree that the land within said right-of-way is the property of Chester C. Davidson and Norma Davidson and that if the right-of-way is ever abandoned, Daniel Davidson and Earlene Davidson agree to execute such instruments of conveyance as may be required to vest said land in Chester C. Davidson and Norma Davidson. Parcels 7 and 8 likewise contain a railroad right-of-way which the parties agree is the property of Daniel Davidson and Earlene Davidson and Chester C. Davidson and Norma Davidson agree to execute such instruments of conveyance as may be required to vest said land in Daniel Davidson and Earlene Davidson if the right-of-way is ever abandoned.

[¶ 16] In the warranty deed executed at the same time as the 1982 Agreement, Daniel and his wife conveyed all of their interest in parcels one through five to Chester and his wife subject "to all easements, reservations, restrictions and rights-of-way of record."

Chester and his wife executed a reciprocal warranty deed to Daniel and his wife, conveying all of their interest in parcels six through nine. In the quitclaim deed executed in 1996, UPRR conveyed all of its right, title and interest in the right of way property, described by metes and bounds, to Daniel's wife, Earlene. UPRR did not warrant it owned anything, but it did reserve the mineral rights.

[¶ 17] The district court interpreted the documents as follows:

> The Court finds that the language of the 1982 Agreement is clear and unambiguous. Likewise, the Court finds that the 1982 Warranty Deeds . . . and the 1996 Quitclaim Deed are clear and unambiguous. Therefore, the Court will secure the parties' intent from the four corners of these documents.
>
> Plaintiff [Chester's successors] initially contends that the first clause of the pertinent provision from the 1982 Agreement establishes its ownership over the right-of-way ("the land within said right-of-way is the property of Chester C. Davidson and Norma Davidson"). The parties to the 1982 Agreement did not hold ownership of the right-of-way, as the contract clearly spells out in the preceding sentence ("Parcels 3 and 4 contain a railroad right-of-way containing 2.78 acres, more or less."). UPRR held ownership over the right-of-way. The parties simply did not own the right-of-way at the time they entered into the 1982 Agreement. Chester and Daniel Davidson's ownership interests in the 160 acres of land did not include the UPRR's right-of-way. Further, the parties have presented no evidence nor contended that the UPRR did not own the right-of-way in 1982. Indeed, each party agrees that the UPRR conveyed its interest in the entire right-of-way to Earlene Davidson by execution of the 1996 Quitclaim Deed. Consequently, the Court finds that the 1982 Agreement is clear and does not attempt to transfer ownership of the right-of-way. The land within the right-of-way is owned by the respective party, just as the 1982 Agreement states. However, the right-of-way was owned by the UPRR at the time of the 1982 Agreement and the agreement

does not operate to vest title and ownership of the right-of-way crossing Parcels 3–4 in Plaintiff.

[¶ 18] The district court's ruling states that the parties did not own any interest in the railroad right of way and did not "attempt to transfer ownership of the right-of-way," but then states that "[t]he land within the right-of-way is owned by the respective party, just as the 1982 Agreement states." Because the district court quieted title to the right of way property in Daniel's successors on the basis of the quitclaim deed from UPRR to their predecessor, the district court apparently presumed UPRR, rather than the Davidsons, owned the fee interest in the right of way.

[¶ 19] The only evidence in the record on appeal about the source of UPRR's interest is the following statement from Daniel's affidavit:

2. My parents acquired the Davidson Ranch in 1928. It was at or after this time that the Valley bought the existent railroad out of bankruptcy and gave the railroad to the Union Pacific Railroad (UPRR). The UPRR acquired the about one-half (1/2) mile of track on the right-of-way that cuts across the Davidson Ranch.

Daniel's statement does not explain what the "Valley" was or describe the nature of UPRR's right of way interest.[4] As such, the record does not contain any direct evidence concerning the source or scope of UPRR's interest.[5]

[¶ 20] It is axomatic that a grantor can convey no greater rights in property than he owns. *See, e.g., Stryker v. Rasch,* 57 Wyo. 34, 41, 112 P.2d 570, 573 (Wyo.1941) (grantee takes no better right than grantor); *Casper Nat'l Bank v. Swanson,* 42 Wyo. 113, 126, 291 P. 812, 816 (Wyo.1930) (same). A quitclaim deed conveys only "the then existing legal or equitable rights of the grantor in the premises therein described[.]" Wyo. Stat. Ann. § 34–2–105 (LexisNexis 2009). Opposing parties in a quiet title action have the responsibility to prove the origin of their claimed interest in the property, although the extent to which they must trace the chain of title depends on the circumstances of the case. *See, e.g., York v. James,* 62 Wyo. 184, 199, 165 P.2d 109, 113 (Wyo.1946) (holding that, because the parties claimed from a common grantor, they were not obligated to show title beyond their common grantor). Thus, without evidence of what interest the railroad owned, the district court could not quiet the fee title to the right of way in Daniels successors simply on the basis of the quitclaim deed from UPRR to their predecessor.

[¶ 21] Although there is insufficient evidence in the record to determine the nature of the railroad's interest, we are able to resolve the issue regarding the meaning of the 1982 Agreement and corresponding warranty deeds. We conclude the 1982 Agreement unambiguously reflects an intention to cross convey all of the interest the Davidsons owned in the land within the right of way to

---

4. The term "right of way" commonly refers to a servitude or easement type interest rather than a fee interest. *Webster's Third New Int'l Dictionary* 1956 (2002); *Jackson Hole Mountain Resort Corp. v. Alpenhof Lodge Assocs.,* 2005 WY 46, ¶ 10, 109 P.3d 555, 559 (Wyo.2005) (stating "[a]n owner of land who grants a right of way over it conveys nothing but the right of passage and reserves all incidents of ownership not granted ...." (citations omitted)). Cases from other jurisdictions reveal that railroad rights of way may be held in various estates. *See, e.g., Lake CDA Investments, LLC v. Idaho Dep't of Lands,* 149 Idaho 274, 233 P.3d 721, 728–29 (2010); *Zobrist v. Culp,* 18 Wash.App. 622, 570 P.2d 147, 152 (1977). The actual deed language creating the right of way is generally determinative. *City Motel, Inc. v. State of Nevada, ex rel. State Dep't of Highways,* 75 Nev. 137, 336 P.2d 375, 377 (1959).

5. On January 5, 2011, nearly three and one half months after oral argument, Daniel's successors filed their notice of additional authority which included a copy of a September 30, 2010, decision letter issued by the district court, denying Chester's successor's motion for relief from judgment under W.R.C.P. 60(b). Part of the basis for the motion was apparently the discovery of the original deed to UPRR's predecessor, which had apparently been recorded in 1916. The district court ruled that the deed confirmed UPRR owned a fee interest in the right of way property. Neither the district court's Rule 60(b) ruling nor the deed affect our task—interpretation of the 1982 Agreement or, in any way, undermine our decision herein.

the brother who received the adjacent property, as part of the partition and cross conveyance of the entire ranch. This intent is reflected in the clear statement, "[t]he parties agree that the land within said right-of-way [in parcels three and four] is the property of Chester C. Davidson and Norma Davidson" and the property in the right way in parcels seven and eight belonged to Daniel and Earlene. The plain meaning of the 1982 Agreement was that Chester and his wife acquired all of the interest the Davidsons owned in the lands within the right of way in parcels three and four.

[¶ 22] The district court concluded that because the warranty in the deed was "subject ... to all easements, reservations, restrictions and rights-of-way of record in the office of the County Clerk and Ex–Officio Register of Deeds for Carbon County, Wyoming," it did not convey the parties' interest in the railroad right-of-way. The court ruled "[t]his language unambiguously omitted the UPRR right of way from the transfer of ownership between the brothers."

[¶ 23] We do not agree that the warranty language in the deeds meant that the lands covered by the right of way were not included in the cross conveyances. Any deed, whether warranty or quitclaim, passes the grantor's interest in the real property described therein to the grantee. *See, e.g., Stansbury v. Heiduck,* 961 P.2d 977, 978 (Wyo.1998) (deed passed only the 90 acres described therein even though both grantor and grantee believed it conveyed 180 acres, requiring the grantee to later bring an adverse possession action to acquire the additional 90 acres). *See also,* Wyo. Stat. Ann. §§ 34–2–102 and –103 (LexisNexis 2009) (form and effect of warranty deed conveys property described therein); Wyo. Stat. Ann. §§ 34–2–104 and –105 (form and effect of quitclaim deed conveys interest grantor owns in property described therein). There is nothing in the record or the parties' arguments indicating that property covered by the railroad right of way was not included in the legal descriptions of the properties conveyed in the warranty deeds.

[¶ 24] Section 34–2–103 governs warranty deeds and states:

Every deed in substance in the above form [§ 34–2–102], when otherwise duly executed, shall be deemed and held a conveyance in fee simple, to the grantee, his heirs and assigns, with covenants on the part of the grantor, (a) that at the time of the making and delivery of such deed he was lawfully seized of an indefeasible estate in fee simple in and to the premises therein described, and had good right and power to convey the same; (b) that the same were then free from all incumbrances; and (c) that he warrants to the grantee, his heirs and assigns, the quiet and peaceful possession of such premises, and will defend the title thereto against all persons who may lawfully claim the same. And such covenants shall be obligatory upon the grantor, his heirs and personal representatives, as fully, and with like effect as if written at length in such deed.

[¶ 25] Consistent with § 34–2–103, the deed language stating that it was "subject ... to all easements, reservations, restrictions and rights-of-way of record" is standard language indicating that the warranty in the deed is limited and does not cover lands affected by recorded encumbrances. Without that language, the grantor would be warranting that the property was free from encumbrances which were already shown on the record. The exception to the warranty does not mean the fee title to the land covered by the right of way and included in the legal description was somehow reserved or excepted from the reciprocal conveyances between Chester and Daniel. The "subject to" language simply put the grantee on notice that the warranty was limited by any recorded encumbrances. We also note that there is nothing in the record indicating the railroad right of way was of record in the county clerk's office to bring it within the "subject to" provision.

[¶ 26] Furthermore, if the provision is interpreted as removing the property covered by the right of way from the conveyance altogether, it is inconsistent with the 1982 Agreement and renders paragraph 6 of that agreement essentially meaningless. Our rules of contract interpretation require us to interpret all documents executed as part of a

single transaction together and consistently with one another. *See, e.g., Houghton,* 57 Wyo. at 206, 115 P.2d at 657; 11 Williston on Contracts § 30:26 (2010).

[¶ 27] The warranty deeds are consistent with the 1982 Agreement and reflect Daniel's and Chester's intent to convey all of the interest they owned in the land within the right of way to the brother who acquired the adjacent property in the partition of the ranch, i.e., land within the right of way in parcels three and four to Chester and land within the right of way in parcels seven and eight to Daniel. In sum, we conclude that the clear language of the 1982 Agreement and warranty deeds resulted in Chester owning all of the interest the Davidsons had in the land within the right of way in parcels three and four.

[¶ 28] The question then becomes—how does the 1982 Agreement relate to Daniel's subsequent acquisition of UPRR's interest? Under the terms of the 1982 Agreement, Daniel and Chester indicated their belief that UPRR had some kind of a right of way over their property and anticipated the right of way may be "abandoned" in the future. In that event, they agreed they would "execute such instruments of conveyance as may be required to vest said land" in the respective party.

[¶ 29] The plain meaning of the term "abandon" as used in the context of the 1982 Agreement means "to give up with the intent of never again asserting or claiming an interest in (a right or property)" or "to renounce one's obligations and rights." *Webster's Third New Int'l Dictionary* 2 (2002). The right of way was physically abandoned when the tracks were removed in 1979; nevertheless, Daniel and Chester obviously believed in 1982 that further action may be needed to extinguish whatever interest UPRR owned and remove the encumbrance from their respective properties. Consequently, they imposed upon one another the obligation to execute any necessary documents to accomplish the full vesting of title when the railroad renounced its interest in the right of way.

[¶ 30] Daniel recognized his obligation under the agreement in his summary judgment affidavit. He stated that, when he was negotiating with UPRR, "the railroad would not agree to divide" the right of way between Chester and him, but would "only agree to sell the right-of-way on our two properties as a whole, i.e., to one purchaser." Daniel averred that he "purchased the right of way for [$6,900] with the thought that [Chester] would purchase his share of it" and, even after Earlene received the quitclaim deed from UPRR, the parties continued to use the property "as it had always been."

[¶ 31] The quitclaim deed evinced UPRR's unequivocal intent to abandon its interest, i.e., never again assert or claim an interest in the property and to renounce whatever rights it had in the right of way.[6] After Daniel acquired whatever interest UPRR owned in the right of way in parcels seven and eight, he held title to both the dominant and servient estates, resulting in termination of the dominant estate.

> When one party acquires a fee title to both the servient and dominant estates, the easement merges into the interest of the servient estate and terminates. Thus, any time the party who owns an easement right acquires legal ownership of a servient tenement, the easement associated with that parcel is extinguished. Such unity of possession destroys all existing easements, because a person cannot have an easement on land that he or she owns.

25 Am.Jur.2d Easements § 100 (2010) (footnotes omitted). Once the right of way was extinguished on Daniel's land, the purposes of paragraph 6 had been accomplished for his successors.

[¶ 32] Because UPRR did not convey to both Chester and Daniel, the quitclaim deed did not result in a merger of the dominant and servient estates on Chester's property. Applying the clear language of paragraph 6,

---

**6.** As noted above, the record does not contain evidence concerning title to the right of way. The parties have presumed the owner was UPRR and for purposes of this litigation that appears to be a logical presumption. If other entities have any claim to the right, those interests would not be affected by this decision.

the railroad abandoned its right of way by executing the quitclaim deed and Daniel was, therefore, obligated to "execute such instruments of conveyance as may be required to vest said land [in parcels three and four]" in Chester.[7]

[¶ 33] Chester's successors argue that the doctrine of estoppel by deed [8] governs this issue. We do not believe estoppel by deed applies in this case because Daniel and Chester specifically recognized the need for future conveyances in their agreement. Specific performance, as requested by Chester's successors in the complaint and summary judgment motion, is the proper legal theory and remedy to be applied here.

> Specific performance is an equitable remedy which compels the performance of a contract on the precise terms agreed upon or such a substantial performance as will do justice between the parties under the circumstances. It is a means of compelling a contracting party to do precisely what he should have done without being coerced by a court. 81 C.J.S. Specific Performance § 2, 701; 71 Am.Jur.2d 10, Specific Performance, § 1; Restatement of the Law, Contracts § 358, Comment a, § 359(2), § 360(b), § 326(c).

*Ekberg v. Sharp,* 2003 WY 123, ¶ 22, 76 P.3d 1250, 1257 (Wyo.2003), quoting *Williams v. Collins Communications, Inc.,* 720 P.2d 880, 892–93 (Wyo.1986).

[¶ 34] Because Daniel's and Chester's clear intent was that the property within the right of way would belong to the party owning the adjacent property, they agreed to execute the appropriate documents to implement that intent in the future. While the district court's ruling that the 1982 Agreement did not "attempt to transfer ownership of the right of way" is accurate with regard to UPRR's interest in the right of way in 1982, the ultimate decision that Daniel owned the land within the right of way across Chester's land ignores the rest of the agreement which transferred any interest owned by Daniel in the land within the right of way in parcels three and four to Chester in 1982 and provided for execution of the necessary documents to vest title in the respective brother in the event of an abandonment. The district court's ruling disregarded an important rule of contract interpretation which requires that courts consider the contract as a whole and give effect to each provision, if possible. *Hall v. Perry,* 2009 WY 83, ¶ 13, 211 P.3d 489, 494 (Wyo.2009). Under the plain terms of the 1982 Agreement, Daniel's successors are, therefore, obligated to specifically perform that obligation and transfer the interest they acquired from UPRR in parcels three and four to Chester's successors.

[¶ 35] Our ruling with regard to specific performance adequately answers the question as to which party in this case has better title to the property at issue. However, to the extent the parties decide that a quiet title order is necessary, we note that, because UPRR quitclaimed whatever interest it had in the right of way to Daniel and Daniel's successors are required under the 1982

---

7. The issue of whether Chester's successors should be required to reimburse Daniel's successors for the consideration Daniel paid to UPRR for Chester's portion of the right of way apparently was not raised in the district court and will not be considered by this Court. We note some potential theories may exist for such reimbursement, including: enforcement of an express agreement between Chester and Daniel regarding payment of consideration; equitable reformation of the 1982 Agreement to provide for equal payment of the costs of removing adverse interests, *see, e.g., Horse Creek Conservation Dist. v. State, ex rel., Wyoming Attorney General,* 2009 WY 143, ¶ 32, 221 P.3d 306, 316 (Wyo.2009); *Hutchins v. Payless Auto Sales, Inc.,* 2002 WY 8, ¶ 19, 38 P.3d 1057, 1063 (Wyo.2002); contribution of co-tenants to the expenses of jointly owned property, including the necessary ex-

penses of purchasing adverse interests, *see, e.g., Andersen v. Griffeth,* 71 Wyo. 136, 145–46, 254 P.2d 1001, 1003–04 (Wyo.1953).

8. Estoppel by deed precludes a party and those in privity with him from denying the truth of his deed by asserting as against the other party thereto any right or title in derogation of the deed. The principle also encompasses the general rule that "one who acquires a title or estate which he has previously conveyed is estopped to assert his after-acquired title as against the grantee or his successors." *Kennedy Oil v. Lance Oil & Gas Co.,* 2006 WY 9, ¶ 28, 126 P.3d 875, 883–84 (Wyo.2006), quoting 3 American Law of Property, §§ 15.18, 15.19 (A. James Casner, ed., 1952). *See also, Balch v. Arnold,* 9 Wyo. 17, 59 P. 434 (1899).

Agreement to convey the same to Chester's successors, Chester's successors would be entitled to an order quieting title in parcels three and four in their favor because, as between the parties before the court, they have the better interest. *See, e.g., Ultra Resources, Inc. v. Hartman,* 2010 WY 36, ¶ 52, 226 P.3d 889, 912 (Wyo.2010).

[¶ 36]   While we have ruled that, on the record before us, Daniel's successors are obligated to specifically perform their contractual obligation, we note that Daniel's successors have pleaded additional affirmative defenses, including a statute of limitations defense.   On remand, the district court may conduct additional proceedings to resolve whether any outstanding affirmative defenses prevent enforcement of the 1982 Agreement and any other issues not addressed in this opinion.

## CONCLUSION

[¶ 37]   The district court erred as a matter of law when it quieted title to the land within the right of way in parcels three and four to Daniel's successors.   Daniel and Chester Davidsons' clear intent in the 1982 Agreement and warranty deeds was to convey all the interest they had in the land within the railroad right of way to the party who received the adjacent property and to execute the appropriate documents in the future when and if the right of way was abandoned to fully vest title in the adjoining property owner.   For purposes of the 1982 Agreement, UPRR abandoned its right of way when it executed the quitclaim deed. On the record before us, Chester's successors are, therefore, entitled to specific performance of the agreement, and Daniel's successors are obligated to convey whatever interest they received from UPRR in parcels three and four to Chester's successors.

[¶ 38]   Reversed and remanded for proceedings consistent with this opinion.