# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 40

### OCTOBER TERM, A.D. 2014

### March 19, 2015

ULTRA RESOURCES, INC., a Wyoming
Corporation,

Appellant
(Defendant),

v.                                                    S-14-0006, S-14-0141

DOYLE and MARGARET M.
HARTMAN, JOHN H. HENDRIX
CORPORATION, MICHAEL L. KLEIN
and JEANNE KLEIN, RONNIE H.
WESTBROOK and KAREN
WESTBROOK,

Appellees
(Plaintiffs).

SWEPI LP, a Delaware Limited
Partnership,

Appellant
(Defendant),

v.                                                    S-14-0007, S-14-0142

DOYLE and MARGARET M.
HARTMAN, JOHN H. HENDRIX
CORPORATION, MICHAEL L. KLEIN
and JEANNE KLEIN, RONNIE H.
WESTBROOK and KAREN
WESTBROOK,

Appellees
(Plaintiffs).

LANCE OIL & GAS COMPANY, a
Delaware Corporation,

Appellant
(Defendant),

v.                                                    S-14-0008

DOYLE and MARGARET M.
HARTMAN, JOHN H. HENDRIX
CORPORATION, MICHAEL L. KLEIN
and JEANNE KLEIN, RONNIE H.
WESTBROOK and KAREN
WESTBROOK,

Appellees
(Plaintiffs).

*Appeal from the District Court of Sublette County*
The Honorable Norman E. Young, Judge

*Representing Appellant Ultra Resources, Inc.:*
    Douglas J. Mason of Mason & Mason, P.C., Pinedale, Wyoming; Michael J. Gallagher, Shannon Wells Stevenson, Natalie West of Davis Graham & Stubbs LLP, Denver, Colorado. Argument by Ms. Stevenson.

*Representing Appellant SWEPI, LP:*
    Patrick J. Murphy, Erica Day of Williams, Porter, Day & Neville, Casper, Wyoming; Phillip D. Barber of Phillip D. Barber, P.C., Denver, Colorado. Argument by Mr. Murphy.

*Representing Appellant Lance Oil & Gas Company:*
    Paul J. Hickey of Hickey & Evans, Cheyenne, Wyoming; Ezekiel James Williams of Lewis Bess Williams & Weese, P.C., Denver, Colorado.

*Representing Appellees:*
    John A. Masterson, Michael J. Sullivan of Lewis Roca Rothgerber LLP, Casper, Wyoming; Jake Eugene Gallegos, Michael J. Condon of the Gallegos Law Firm, P.C., Santa Fe, New Mexico. Argument by Mr. Sullivan and Mr. Condon.

*Before BURKE, C.J., and HILL, KITE, DAVIS, JJ., and GOLDEN, J., retired.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KITE, Justice.**

[¶1]     Appellants/Defendants Ultra Resources, Inc. (Ultra), SWEPI, LP (SWEPI) and Lance Oil & Gas Co. (Lance Oil)[1] appeal from the district court's orders after Appellees/Plaintiffs Doyle and Margaret Hartman, et. al. filed a motion to enforce a judgment and net profits contract (NPC) pertaining to oil and gas leases in Sublette County, Wyoming.[2]   The defendants claim the district court did not have jurisdiction to rule on the issues presented in the plaintiffs' motion to enforce.  They also contest the district court's decision on the merits of the motion to enforce and its award of attorney fees to the plaintiffs.  We conclude the district court had jurisdiction over the issues presented, it correctly interpreted its prior judgment and the defendants' accounting responsibilities under the NPC, and it properly granted the plaintiffs' request for attorney fees, although we do order a minor revision of the award.

[¶2]     We affirm with revision.

## ISSUES

[¶3]     The issues[3] on appeal are:

---

[1] Lance Oil did not file a separate brief.  Instead, it joined the arguments presented in Ultra's and SWEPI's briefs, with the exception of their arguments on the attorney fee award which did not apply to Lance Oil because it was a non-operator working interest owner.

[2] Initially, there were two additional appeals related to this matter.  Supreme Court Case No. S-14-0009 was an appeal brought by defendants WPX Energy RM Company, f/k/a Williams Production Rocky Mountain Co., and Arrowhead Resources (U.S.A.), Ltd.  We dismissed the appeal for want of prosecution when the appellants' brief was not filed in a timely manner and refused to reinstate the appeal on a later petition.  Supreme Court Case. No. S-14-0010 was a cross-appeal brought by the plaintiffs which was voluntarily dismissed.

[3] We restate the issues presented in the parties' opening briefs, but do not include the "issues" presented by defendants in their reply brief.  W.R.A.P. 7.03 governs reply briefs:

> Appellant may file a brief in reply which shall comply with the requirements of W.R.A.P. 7.01(a), (b), (c), (f), (g), (h), and (i). In lieu of any statement of the issues, the reply brief shall precisely and concisely set forth on the first page those new issues and arguments raised by the brief of the appellee which are addressed in the reply brief. A reply brief is limited to such new issues and arguments, and a failure to comply with these requirements may subject the party to sanctions under these rules.

In large part, the defendants' reply brief simply includes further argument on the issues included in their opening briefs.  "Presenting argument in a reply brief is not equivalent to framing the issues in an opening brief. A reply brief is not a second chance to raise an issue or present argument that the appellant had the responsibility, but failed, to address in its opening brief." *Ferrell v. Knighten,* 2013 WY 37, ¶ 11, n.1, 298

1. Did the district court have jurisdiction to consider the plaintiffs' motion to enforce the judgment and the NPC?

2. Did the district court err by ruling that defendants were not entitled to credit for expenses which were invoiced prior to 2007 because they should have been charged against the net profits interest (NPI) during the time period at issue in the trial?

3. Did the district court err by ruling that, under the terms of the NPC, expenses had to be charged against the NPI in the month following the month the expenses were invoiced?

4. Did the district court err by rejecting the defendants' argument, based upon the principles of estoppel and finality, that the plaintiffs had agreed and the district court had previously ordered expenses would be charged against the NPI when billed to other working interest owners in joint interest bills (JIBs)?

5. Did the district court err in awarding attorney fees to plaintiffs?

**FACTS**

[¶4]    The parties own interests in certain oil and gas leases in Sublette County, Wyoming. *Ultra Resources, Inc. v. Hartman,* 2010 WY 36, ¶ 10, 226 P.3d 889, 902 (Wyo. 2010) (*Ultra I*). Defendants Ultra and SWEPI[4] are working interest owners and operators of the leases, defendant Lance Oil is a non-operator working interest owner, and the plaintiffs own a NPI in the leases. *Id.,* ¶ 11, 226 P.3d at 902-03. In the underlying litigation, the district court entered a declaratory judgment recognizing the existence of the NPI and delineating the operators' NPC accounting responsibilities. It also granted a monetary judgment against the defendants for the amount due to the plaintiffs for the NPI through December 31, 2006. *Id.,* ¶¶ 14, 17, 226 P.3d at 903-04. With a few exceptions not relevant here, we affirmed the district court's decision in *Ultra I*. After our mandate issued, the district court entered an amended judgment and the defendants paid the monetary judgment.

[¶5]    In July 2010, the plaintiffs filed a motion to enforce judgment, claiming the defendants were not properly accounting to them as required by the earlier declaratory

---

P.3d 161, 163, n.1 (Wyo. 2013), quoting *Ultra Resources, Inc. v. McMurry Energy Co.,* 2004 WY 121, ¶ 11, 99 P.3d 959, 963 (Wyo. 2004).

[4] At the time of the trial, Shell Rocky Mountain Production, LLC was an operator and SWEPI was a non-operator working interest owner. *Ultra I,* ¶ 11, 226 P.3d at 902-03. On December 31, 2008, Shell merged into SWEPI and SWEPI took Shell's position as operator of the relevant leases.

judgment and the NPC. The defendants asserted the district court did not have jurisdiction to consider the matters raised in the plaintiffs' motion to enforce and the plaintiffs should have commenced a new action instead. The district court concluded it had jurisdiction and issued a number of orders on the merits of the plaintiffs' motion to enforce.

[¶6] The primary order at issue here pertains to the defendants' attempts to charge pre-2007 expenses to calculate the NPI starting January 1, 2007. The district court ruled that the NPI had been fully calculated through December 31, 2006 at trial, and the NPC required expenses to be charged to the NPI in the month following the date the expenses were invoiced. Consequently, the district court refused to allow the defendants to charge expenses invoiced prior to January 1, 2007, when calculating the 2007 NPI. The district court also concluded the plaintiffs were the prevailing parties in the enforcement proceeding pursuant to the Wyoming Royalty Payment Act (WRPA), segregation of the attorney fees between claims was not required and the operating defendants were required to pay the plaintiffs' attorney fees.

[¶7] The defendants appealed the district court's decisions on the merits and its order on attorney fees. We will provide additional factual background as relevant to the issues discussed below.

## DISCUSSION

### 1. Jurisdiction

[¶8] The defendants maintain the district court did not have subject matter jurisdiction to decide the issues raised in the plaintiffs' motion to enforce and the plaintiffs should have commenced a new civil action to have the matters heard. "The existence of subject matter jurisdiction is a question of law that we review *de novo.*" *Madsen v. Bd. of Trustees of Memorial Hospital of Sweetwater County,* 2011 WY 36, ¶ 9, 248 P.3d 1151, 1153 (Wyo. 2011), citing *Cantrell v. Sweetwater County School Dist. No. 2,* 2006 WY 57, ¶ 6, 133 P.3d 983, 985 (Wyo. 2006). *See also Stephens v. Lavitt,* 2010 WY 129, ¶ 9, 239 P.3d 634, 637 (Wyo. 2010).

[¶9] In *Ultra I,* the case was remanded to the district court for further proceedings consistent with our decision. The defendants argue the district court's jurisdiction over the action ended when the district court entered an amended judgment consistent with our mandate and they satisfied the monetary judgment. Thus, they claim the district court did not have jurisdiction to consider the issues raised in the plaintiffs' motion to enforce. The two aspects of the district court's order challenged by the defendants are the district

court's exclusion of the pre-2007 expenses from the 2007 NPI accounting and its interpretation of the NPC deadlines for the operators' expense reports.[5]

[¶10] Courts have inherent power to enforce their own judgments. In *Hurd v. Nelson,* 714 P.2d 767 (Wyo. 1986), we affirmed the district court's post-judgment order enforcing a property settlement in a divorce action. Speaking to the district court's enforcement powers, we stated:

> "Courts have inherent power to enforce their own judgments and should see to it that such judgments are enforced when they are called upon to do so. To deprive a court of power to execute its judgments is to impair its jurisdiction, and the general rule is that every court having jurisdiction to render a particular judgment has inherent power and authority to enforce it and to exercise equitable control over such enforcement. Thus, a court of equity has inherent power to enforce its decrees. A court of equity retains and possesses the power to control the manner of the execution of its decree, and has the inherent right to modify, by a subsequent order, the manner in which it shall be enforced. * * * " 46 Am.Jur.2d Judgments § 898, p. 1032 (1969).

*Id.* at 771.

[¶11] A court also has inherent power to interpret its judgments and clarify ambiguous terms. 46 Am. Jur. 2d *Judgments* § 73 (2015) states:

> Trial courts have the inherent authority to interpret and clarify their judgments. The mere interpretation of a judgment involves no challenge of its validity, or an attack on it, and a clarification of an ambiguous judgment is not a modification or amendment of the judgment. An order clarifying a judgment explains or refines rights already given, and it neither grants new rights nor extends old ones. Unlike a modification, amendment, or alteration to a judgment, which must be accomplished under the court rules or some other

---

[5] The district court entered other post-judgment orders including an order confirming exclusion of division expenses, an order approving a set of reporting forms, and an order regarding the plaintiffs' rights to access the defendants' accounting records. Although parties may not confer jurisdiction on a court by agreement when it does not exist, *White v. Bd. of Land Comm'rs,* 595 P.2d 76, 79 (Wyo. 1979), the defendants do not contest those rulings on appeal and we will not specifically discuss them.

4

> exception to preclusion, a clarification of a judgment can be accomplished at any time.

(footnotes omitted). *See also Ladwig v. Chatters,* 623 N.W.2d 266 (Minn. Ct. App. 2001) (trial court had jurisdiction to interpret, clarify and enforce its earlier judgment).

[¶12] In *Zaloudek v. Zaloudek,* 2010 WY 169, 245 P.3d 336 (Wyo. 2010), we addressed the husband's post-judgment motions to clarify his obligations under the property division provisions of a divorce decree and to extend his deadline for compliance with a cash award to the wife. The district court denied the husband's motions, entered a judgment in favor of the wife for interest accrued since the original decree and ordered the husband to satisfy the judgment within five days. *Id.,* ¶ 6, 245 P.3d at 339. Relying on *Hurd, supra,* we concluded the district court's post-judgment rulings were authorized because they fell within the court's inherent authority to enforce its own judgments. *Id.,* ¶ 13, 245 P.3d at 341.

[¶13] The defendants argue that *Hurd* does not provide authority for the district court's actions in this case because it was a divorce action and the legislature specifically granted courts continuing jurisdiction in such cases. Wyo. Stat. Ann. § 20-2-203 (LexisNexis 2013) grants courts continuing jurisdiction to enforce and modify orders concerning the care, custody and visitation of children after a divorce decree. However, *Hurd* addressed property division issues and § 20-2-203 does not grant continuing jurisdiction to courts to modify property divisions in divorce decrees. *Glover v. Crayk,* 2005 WY 143, ¶ 6, 122 P.3d 955, 957 (Wyo. 2005).

[¶14] Instead, *Hurd* specifically addressed the court's inherent power to enforce its own orders. The power is, of course, limited to interpretation and clarification of orders and enforcement of their terms. In doing so, the court must stay true to the earlier judgment. In *Eddy v. First Wyoming Bank,* 713 P.2d 228, 235 (Wyo. 1986), this Court confirmed that the district court may interpret an earlier judgment pursuant to a post-judgment motion to clarify. We stated the court may take additional evidence at a post-judgment hearing to effectuate the original intent of the order. *Id. See also Glover,* ¶ 13, 122 P.3d at 958 (interpreting motion to amend or modify a divorce decree as a motion to correct a clerical mistake under W.R.C.P. 60(a)). The district court in the case at bar, therefore, had inherent authority to interpret, clarify and enforce its judgment in accordance with its original intent.

[¶15] In contesting the district court's jurisdiction over the post-judgment proceedings, the defendants also fail to recognize the significance of the declaratory judgment aspects of the original decision. The trial judgment stated:

> 98.     The defendants remain obligated to and shall perform the required NPI accounting on a consolidated basis

5

and make payments monthly to the plaintiffs commencing with production month January 2007, and shall do so in accordance with the terms of the Net Profits Contract and its Accounting Procedure and in compliance with the Court's Findings of Fact, 25-30, *supra.*

The referenced findings of fact stated:

25. Proper accounting for the NPI involves expenses and revenues allocable to operations under the Exhibit A leases to the Net Profits Contract and more recently the Subject Leases . . .

26. The plaintiffs' NPI is 4.98%, rather than 5.0%, because of the small interest owned by a non-plaintiff.

27. The Net Profits Contract sets forth the terms to be applied and honored in order to perform proper computation of any payable net profits. The accounting requirements are set forth in the body of the Net Profits Contract, in Exhibit A listing the permitted royalty and overriding royalty burdens on the leases, and in Exhibit C-1, which is an Accounting Procedure.

28. The Net Profits Contract Accounting Procedure may not be amended without the consent or approval of Novi or its successors in interest, including plaintiffs or their successors in interest. The Net Profits Accounting Procedure has never been amended.

29. The Net Profits Contract and the Net Profits Accounting Procedure establish principles to be followed in performing the proper accounting of the NPI as follows:

(a) Plaintiffs' net profits [interest] equals 4.98% of cumulative gross revenue less cumulative expenses on a consolidated basis associated with the operation of NPI leases and wells on those leases;
(b) The NPI is to be calculated each month and the incremental net profits for that month, if positive, is to be paid as soon as practicable after the end of any month in which net profits have been realized;
(c) Gross revenue is based on proceeds from wellhead gas

6

and oil sales and on fair market value for other sales;

(d) Deductible expenses are those that are reasonable and customary in connection with the operation and development of oil and gas properties. These expenses are properly chargeable against the NPI leases and are limited by amounts specified in the Accounting Procedure unless and until that procedure is amended as provided therein;

(e) Expenses that are not reasonable and customary and not properly chargeable in connection with the operation and development of NPI leases and therefore, not deductible, include, among others, federal income tax, interest on capital and other expenses, depreciation, acquisition costs, accrual accounts, and future asset retirement accounts;

(f) The Accounting Procedure limits the amount of deductible labor expense (including employee benefits), Pinedale district office expense, well overhead rates, and legal expenses; and

(g) Deductible expenditures that benefit both NPI and non-NPI wells are allocated based on the ratio of the operators' end-of-year NPI well count to total well count.

30. In performing the NPI accounting, the only permitted burden deductions from gross revenues are the overriding royalty and landowners' royalties set forth in the listing of leases on Exhibit A to the Net Profits Contract. The permissible burdens on the Subject Leases are depicted on Exhibit B attached and incorporated herein.

[¶16] The Uniform Declaratory Judgments Act, as adopted in Wyoming at Wyo. Stat. Ann. § 1-37-101 through § 1-37-115 (LexisNexis 2013), has a provision that specifically authorizes "further relief" in a declaratory judgment action. Section 1-37-110 states:

**§ 1-37-110. Supplemental relief**

Further relief based on a declaratory judgment may be granted. Application therefor shall be by petition to a court having jurisdiction to grant the relief. If the application is sufficient the court, on reasonable notice, shall require any adverse party whose rights have been adjudicated by the declaratory judgment to show cause why further relief should not be granted.

7

[¶17] Section 1-37-110 has been cited as authority for courts' post-declaratory judgment determinations in various contexts for many years. In *In re General Adjudication of All Rights to Use Water in the Big Horn River System,* 835 P.2d 273 (Wyo. 1992), the tribes filed a motion for order to show cause why the state engineer should not be held in contempt for failing to follow an earlier declaratory judgment concerning tribal water rights. While sorting out various orders that had previously been entered in the case, we addressed the state engineer's duty to follow and implement earlier declaratory judgment rulings. We cited § 1-37-110 as authority for the following statement:

> When . . . it is impossible to determine if the tribal right is being violated because the right itself is in some respect ill-defined, the state engineer should promptly seek clarification from the district court so that appropriate remedial action, if needed, may be undertaken. *See* Wyo. Stat. §§ 1–37–106 & 1– 37– 110 (1988).

*Id.* at 283. This statement contains an implicit recognition of the district court's jurisdiction to grant further relief in declaratory judgment actions. *See also Beatty v. Chicago, B. & Q. R. Co.,* 52 P.2d 404, 409 (Wyo. 1935) (stating statute allowing for further declaratory relief permits post-judgment assessment of damages).

[¶18] Learned treatises and decisions from other jurisdictions also demonstrate the courts' broad powers under the Uniform Declaratory Judgments Act.

> In a proceeding for a declaratory judgment, the court may properly grant declaratory and nondeclaratory relief in a single action, when such relief is requested in the pleadings by the parties, or where the request for nondeclaratory relief is found to be supplemental to the declaratory relief. <u>A court generally has jurisdiction to grant further and necessary or proper relief, including any relief essential to effectuate the declaratory judgment entered by the court.</u> A court has the power, for example, to retain jurisdiction and grant further relief where it has entered a declaratory judgment declaring the rights of the parties under a contract. In such a case, the court may enter such supplemental judgments and orders, from time to time, as are necessary to the supervision of the contract.
> . . . .
> <u>Under a statute authorizing supplemental relief, the court may be permitted to reserve the right to make such further orders as might be necessary to effectuate the judgment, even</u>

8

> though no separate proceeding is initiated to obtain such
> relief.

24 C.J.S. *Declaratory Judgments* § 171 (2015) (footnotes omitted and emphasis added).

[¶19]  The Restatement (Second) of Judgments § 33 (1982, updated 2014) discusses the flip side of the court's power to grant supplemental declaratory relief, i.e., the preclusive effect of a declaratory judgment is not as broad as in other civil actions.  While an issue that was actually considered and decided in a declaratory judgment act is conclusive in a subsequent action between the parties as to the specific matters declared, the "further relief" provision of the act allows for additional or supplemental relief to be granted between the same parties on the same claim.  *Id.*  The reason for the departure from the usual preclusion rules "'is that the losing party in a declaratory judgment action can normally be expected to recognize the rights declared by the judgment and act accordingly, but that if he fails to do so, the court should have ample power to enforce the judgment by subsequent coercive orders, whether or not such relief was sought in the original action.'"  *Alsheikh v. Arabian Nat'l Shipping Corp.,* 2009 WL 884795, * 2 (Tex Ct. App. 2009), citing *Valley Oil Co. v. City of Garland,* 499 S.W.2d 333, 336 (Tex. Ct. App. 1973).

[¶20]  In *Horn & Hardart Co. v. Nat'l Rail Passenger Corp.,* 843 F.2d 546 (D.C. Cir. 1988), the landlord sought "further relief" in a declaratory judgment action involving the termination of a commercial lease.  In the original action, the district court upheld the landlord's right to terminate the lease but ordered it to compensate the tenant under the early termination clause, and the circuit court affirmed that decision.  When the tenant did not vacate the premises after the declaratory judgment was entered, the landlord brought an action for "further relief" under the Declaratory Judgments Act, seeking payment under the "end-of-term holdover and cost-on-default clauses" of the lease.  The district court granted the landlord's request for further relief and the tenant appealed, claiming the district court lost jurisdiction over the matter after the original order was appealed.

[¶21]  The D.C. Circuit Court rejected that assertion, stating:

> The "further relief" provisions of both state and federal declaratory judgment statutes clearly anticipate ancillary or subsequent coercion to make an original declaratory judgment effective. Neither a completed appeal, nor a considerable period of delay after the trial court ruling terminates this authority. [The further relief provision's] retained authority, commentators have noted, "merely carries out the principle that every court, with few exceptions, has inherent power to enforce its decees and to make such orders as may be

9

necessary to render them effective." Borchard, Declaratory Judgments 441 (2d ed.1941)[.]

*Horn,* 843 F.2d at 548 (footnotes and some citations omitted). *See also Casa Balcona Terrace Cooperative v. Lyod,* 2009 WL 1221257 (Mich. Ct. App. 2009).

[¶22] A Montana district court granted further relief after an earlier declaration in a property boundary dispute between adjacent landowners. *Goodover v. Lindey's Inc.,* 843 P.2d 765 (Mont. 1992). While the original declaratory judgment action was pending, one of the landowners placed improvements upon the land which was eventually declared to belong to the other. *Id.* at 767-68. After the judgment was entered, the burdened landowner brought an action for supplemental declaratory relief requesting the court to order removal of the encroachments and seeking damages for loss of use of the property. Pursuant to its supplemental relief jurisdiction, the district court ordered the encroaching party to submit a work plan detailing the removal of the encroachment and ordered that party to pay damages to the burdened party. *Id.* at 768. The Montana Supreme Court upheld the district court's actions and ruled that, under the Declaratory Judgments Act, the district court retained jurisdiction to grant relief necessary to enforce its order. This continuing jurisdiction gave the court authority to grant monetary damages and order coercive action to provide complete relief in the declaratory judgment action. *Id.* at 770.

[¶23] The further relief provision of the Declaratory Judgments Act does, however, have limitations. In *Oklahoma Alcoholic Beverage Control Bd. v. Central Liquor Co.,* 421 P.2d 244 (Okla. 1966), the Oklahoma Supreme Court considered whether the trial court had jurisdiction under the further relief provision of the Declaratory Judgments Act to address an entirely new issue that was not raised in the initial action. The court stated that the further relief "provision was not intended to give the court continuing jurisdiction to resolve subsequent disputes between the parties over matters not involved in the original litigation." *Id.* at 247. *See also Port Everglades Authority v. International Longshoremen's Assoc., Local 1922-1,* 652 So.2d 1169 (Fla. Ct. App. 1995) (holding that trial court's retention of jurisdiction under the Declaratory Judgments Act was overly broad because it extended well beyond the sunshine law violation originally alleged and ruled upon in the original declaratory judgment action).

[¶24] This precedent makes it abundantly clear that a district court maintains jurisdiction to consider and order further relief on matters addressed in a declaratory judgment action. As a practical matter, if a court has no jurisdiction to enforce its declaratory judgment, the judgment would have no true legal effect. A declaratory judgment is, by its nature, abstract. The purpose of the Declaratory Judgments Act is "to settle and to afford relief from uncertainty and insecurity with respect to legal relations, and [the Act] is to be liberally construed and administered." Wyo. Stat. Ann. § 1-37-114. In order to serve the purposes of the act, the district court must have power to enforce its ruling when the parties actually put it into effect.

10

[¶25] The defendants also claim the NPC is a divisible installment contract which requires separate actions for different time periods. In *Sagebrush Dev., Inc. v. Moehrke,* 604 P.2d 198, 204 (Wyo. 1979), this Court ruled prospective damages could not be awarded for future breaches of a contract requiring separate payments or performance; instead, a separate action must be brought after the plaintiff has actually sustained the damages. Here, the district court's trial judgment awarded the plaintiffs NPI damages for the time period of March 2006 through December 2006 and included a declaratory judgment that the defendants continue to account to the plaintiffs and make payments in accordance with the NPC. In the enforcement action, the district court determined whether the pre-2007 expenses were, or should have been, included within the earlier trial proceedings and the propriety of the defendants' methods of complying with its ongoing accounting requirements under the declaratory judgment.

[¶26] Notably, the district court did not determine the amount of net profits due for any period after December 31, 2006, even though the plaintiffs presented evidence showing the calculation of the post-trial NPI. The district court's refusal to calculate the NPI in subsequent periods was a proper recognition of the limits of its jurisdiction. *See generally*, *Oklahoma Alcoholic Beverage* and *Port Everglades, supra.* By limiting the scope of its post-judgment order, the district court also avoided a violation of the legal principles pertaining to installment or divisible contracts. The district court properly interpreted its former judgment and supplemented the declaration contained therein.

[¶27] One additional matter merits our attention before we leave the jurisdictional issue. The defendants claim they were denied due process as a result of the plaintiffs' failure to commence a new action to address the issues raised in the motion to enforce. In particular, they lament the absence of the procedures available under the rules of civil procedure when a new action is commenced, including the discovery provisions. As our description of Wyoming precedent on motions to clarify and/or enforce judgments indicates, commencing a new action was not required. Section 1-37-110 provides that the request for further relief be made by a petition to the district court which will, if appropriate, require the defendant to show cause why further relief should not be granted. Neither the plaintiffs nor the district court strictly followed the process set out in the statute. Instead of filing a petition for further relief under the Declaratory Judgments Act, the plaintiffs filed a motion to enforce the judgment and the district court did not issue an order to show cause.[6]

---

[6] At one point, there was discussion of a possible order to show cause as to why the defendants should not be held in contempt of court. The contempt process was later abandoned by the district court and the plaintiffs when they realized there was no factual basis for concluding the defendants had willfully violated a clear term of a court order. *See generally*, *Greene v. Finn,* 2007 WY 47, ¶¶ 14-15, 153 P.3d 945, 951 (Wyo. 2007).

[¶28] While it would have been preferable for the statutory procedure to be followed, the failure did not impact the defendants' procedural opportunities to contest the motion. The defendants countered the plaintiffs' motion to enforce with various responses; the parties conducted some discovery during the post-judgment proceedings, including taking the experts' depositions; and the district court held several hearings to address the outstanding matters. It should be noted that the defendants' appellate argument suggesting they needed the discovery protections offered by a new action ignores the fact that the relevant accounting information was in their possession. Furthermore, the defendants actually objected in 2011 to the plaintiffs' efforts to obtain additional discovery in the post-judgment proceedings. Although the defendants make a vague argument that they did not receive adequate process, they do not demonstrate how their due process rights to notice and the opportunity to be heard were violated.

[¶29] Cases from other jurisdictions establish that "further relief" under the Declaratory Judgments Act may be granted through a variety of procedural mechanisms. In *Juban v. Schermer,* 751 A.2d 1190, 1191-92 (Pa. Super. 2000)*,* the court entered a declaratory judgment on the validity of a land title transfer and the petitioner subsequently filed a petition seeking damages as a result of the respondent's use of the property while the declaratory action was pending. Although the Pennsylvania statute set out a procedure similar to ours with a petition for further relief followed by an order to show cause, there is no indication that the trial court specifically issued an order to show cause. It appears that the matter proceeded after the respondents objected to the petition. *Id.*

[¶30] Some other states' declaratory judgment statutes simply require reasonable notice and a hearing, without having the district court issue an order to show cause. *See, e.g.*, *Casa Balcona* and *Horn, supra.* There is no question that the defendants received notice and the opportunity to be heard in this case. We, therefore, conclude the district court had jurisdiction to consider the specific issues presented in this matter under its inherent authority to interpret and enforce its own judgment and the further relief provision of the Declaratory Judgments Act.[7] Section 1-37-110.

## 2. Pre-2007 Expenses/Timing of Expense Reporting

[¶31] The next three issues all pertain to the district court's interpretation of its judgment from the 2007 trial and the defendants' ongoing NPC accounting responsibilities, particularly the timing of expense reporting. The district court held an evidentiary hearing and set out its decision with findings of fact and conclusions of law. We, therefore, review its findings of fact under the clearly erroneous standard and its conclusions of law *de novo*.

---

[7] The parties stipulated the post-judgment proceedings would conclude after resolution of the pre-2007 expense issue. They agreed other issues pertaining to the accounting and calculation of the NPI from January 1, 2007, forward would not be addressed in the motion to enforce proceedings but would be reserved for a future lawsuit.

We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to the trial court's findings unless they are unsupported by the record or erroneous as a matter of law. *Deroche v. R.L. Manning Co.,* 737 P.2d 332, 336 (Wyo.1987). Although the factual findings of a trial court are not entitled to the limited review afforded a jury verdict, the findings are presumptively correct. *Piroschak v. Whelan,* 2005 WY 26, ¶ 7, 106 P.3d 887, 890 (Wyo.2005).

This Court may examine all of the properly admissible evidence in the record, but we do not reweigh the evidence. *Forshee, et ux. v. Delaney, et ux.,* 2005 WY 103, ¶ 6, 118 P.3d 445, 448 (Wyo.2005). Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses. We accept the prevailing party's evidence as true and give to that evidence every favorable inference which may fairly and reasonably be drawn from it. *Harber v. Jensen,* 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo.2004) (quoting *Life Care Centers of America, Inc. v. Dexter,* 2003 WY 38, ¶ 7, 65 P.3d 385, 389 (Wyo.2003)). Findings may not be set aside because we would have reached a different result. *Harber,* ¶ 7, 97 P.3d at 60 (citing *Double Eagle Petroleum & Mining Corp. v. Questar Exploration & Production Co.,* 2003 WY 139, ¶ 6, 78 P.3d 679, 681 (Wyo.2003)). A finding will only be set aside if, although there is evidence to support it, this Court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Mullinnix LLC v. HKB Royalty Trust,* 2006 WY 14, ¶ 12, 126 P.3d 909, 916 (Wyo.2006) . . . .

We review questions of law de novo. *Y–O Investments, Inc. v. Emken,* 2006 WY 112, ¶ 8, 142 P.3d 1127, 1130 (Wyo.2006).

*Ultra I,* ¶ 97, 226 P.3d at 922-23, quoting *Snelling v. Roman,* 2007 WY 49, ¶¶ 7–9, 154 P.3d 341, 345 (Wyo. 2007).

[¶32]  In order to understand the expense issue, it is necessary to provide some context. Under the NPC, the defendants (successors to the First Parties) have accounting and payment obligations to the plaintiffs (successors to Novi).

13

1. NET PROFITS INTEREST—

Subject to the conditions hereinafter set forth, First Parties agree to pay to Novi a sum or sums representing 5% of the net profits (as hereinafter defined), herein referred to as "said net profits interest," resulting from operations for oil and gas by First Parties, or any of them, under those certain leases[.]

2. COMPUTATION—

Net profits shall be computed on the basis of all operations under the Pinedale Unit applicable to said leases . . . . :

Net profits as used herein shall mean the gross revenue (not required for payment of the overriding royalties shown on Exhibit A and landowners' royalties) from unit operations allocable to said leases after deduction of all expenses of unit operations (unit operations being construed to include all operations of any of First Parties under said leases) except those charged to the working interest owners, if any, under the said unit other than First Parties.

Expenses shall include by way of illustration but not by way of limitation, expenses incurred in connection with the preparation for the drilling of and drilling of wells, whether productive or dry; the equipping, completing, plugging and abandoning of wells; the producing of wells and treatment, storage and marketing of production therefrom; the building of roads, campsites and the making of improvements in connection with unit operations; expenses incurred in connection with exploratory work conducted in connection with operations hereunder; expenses incurred in connection with the examining and perfecting of and defense of titles to said leases, including attorneys' fees incurred in connection therewith; losses, damages or liabilities sustained or incurred in connection with unit operations; gross production and ad valorem taxes or any tax measured by production; premiums paid for workmen's compensation insurance, public liability, fire, wind, tornado or other insurance; and any other expenses and charges that are reasonable and customary in connection with the operation and development of oil and gas properties

14

and which are properly chargeable against the leasehold interests. Without limiting the foregoing, the accounting with respect to unit operations shall be in accordance with the Accounting Procedure attached hereto and marked "Exhibit C–1" and made a part hereof to the extent that such exhibit is applicable and not inconsistent with the foregoing provisions and including the overhead charges provided for in said exhibit.

3. PAYMENT—

Inasmuch as the Operator in charge of operations under said leases and under the said Pinedale Unit Agreement will either be Continental or El Paso, or both, the responsibility for handling the accounting for net profits and making payments hereunder to Novi for its share thereof shall be the responsibility of Continental and El Paso, such parties (or either of them) being hereinafter sometimes referred to for convenience as "Operator."

Novi shall be entitled to receive its percentage of net profits at the end of any month whenever it shall appear at the end of such month that net profits have been realized as a result of operations under said leases, taking into consideration all expenses theretofore incurred in connection with such operations and all accounts payable or receivable with regard thereto at the end of said month and all payments of net profits theretofore made to Novi. In making the foregoing computations, deficits shall be carried over from month to month and the accumulated total thereto applied against subsequent earnings before profits will be considered to have accrued. Payment of such net profits shall be made as soon as practicable after the end of any month in which net profits have been so realized. Notwithstanding that there may be separate operations under said leases relating to separate deposits of oil and gas (whether conducted by Continental or El Paso or some by Continental and some by El Paso), all accounting for the purpose of determining net profits hereunder shall be upon a consolidated basis involving all operations under said leases and the said Pinedale Unit.

Operator shall keep an accurate record of all accounts hereunder, showing the costs and expenses incurred and

15

charges made and all receipts and credits received, which record shall be available at all reasonable times for the examination and inspection of Novi or its duly authorized representative. Within one (1) month after the close of each calendar month, Operator shall furnish to Novi a statement of costs and expenses incurred and charges made and all receipts and credits received during such calendar month.

(Emphasis added.)

[¶33] At the time of the 2007 trial, the defendants denied the continued existence of the NPI and had never properly accounted to the plaintiffs under the terms of the NPC. The information used to calculate the NPI at trial was not provided by the defendants pursuant to timely reporting under the NPC but was, instead, provided in the litigation discovery process. The district court's judgment, which was affirmed in all relevant respects by this Court, included an award of net profits from March 2006 through December 2006.[8] The district court made a number of determinations as to what expenses were properly deductible in calculating the NPI, generally relying upon the calculation performed by the plaintiffs' expert accounting witness, David Johnson. In total, over $2 billion in expenses were allowed as deductions in calculating the net profits at trial, including $888.4 million for 2006. The excluded expenses included Ultra's "accrual accounts" of $77,752,958 and Shell's accumulator accounts of $59,212,079.

[¶34] Little was known about the accrual and accumulator accounts at trial. Mr. Johnson testified that he did not believe the expenses in the accounts were properly deductible at the time of trial because Ultra represented the amounts in the accrual accounts were "estimates," suggesting that no invoices had been received for the expenses, and Shell indicated the expenses in the accumulator accounts could not be specifically tied to NPI wells. The defendants did not provide any detail on the expenses included in the challenged accounts, so there was no evidence of the activity date (the date the goods or services were provided to the operators), the invoice date, or the date of payment. Given the defendants' characterization of the expenses in the accounts and the lack of information about them, the district court rejected the defendants' efforts to deduct the accrual and accumulator accounts from the revenues to determine the net profit for trial. The defendants did not appeal the district court's rejection of the accrual and accumulation accounts after the first trial and, consequently, we did not address that ruling in *Ultra I*.

---

[8] Although net profits had been earned beginning in May 2005, the defendants were not obligated to pay the plaintiffs until March 2006 because the plaintiffs did not give notice of their ownership of the NPI, as required by the NPC, until February 2006. *Ultra I,* ¶¶ 66-67, 73, 226 P.3d at 916-17.

16

[¶35]  As we stated above in Paragraph 14, the district court also ruled after the 2007 trial that the defendants were required to perform an ongoing "NPI accounting on a consolidated basis and make payments monthly to the plaintiffs commencing with production month January 2007," in accordance with the terms of the NPC and the judgment.  After we affirmed the district court's decision, the defendants provided accounting statements to the plaintiffs which indicated they were charging expenses with activity dates prior to January 1, 2007 to the 2007 NPI accounting.  When the plaintiffs questioned the defendants about the pre-2007 expenses, the defendants claimed the expenses were properly included in the 2007 accounting because they had been excluded from the trial accounting as accrual and accumulator accounts.

[¶36]  In a series of hearings on the plaintiffs' motion to enforce starting in 2010 and continuing through April 2013, the parties argued about whether the expenses prior to January 1, 2007, should be included in the 2007 accounting.  The plaintiffs generally advanced two arguments against including the pre-2007 expenses in the post-trial accounting.  The first was that the trial in 2007 was intended to determine a complete NPI accounting through December 31, 2006, and the defendants were obligated to provide all of their pre-2007 expenses for deduction from the trial NPI.  The plaintiffs' second argument was the NPC required the defendants to report expenses within one month after the month they were incurred.  They argued that an expense was "incurred" for purposes of the NPC when it was invoiced by a third party supplier or service provider to the operators.

[¶37]  The defendants argued the invoice date was irrelevant and the pre-2007 expenses reported in the 2007 accounting were timely because they were reported to the NPI owners at the same time the operators billed them to the other working interest owners through the joint interest billing (JIB) process.  In other words, according to the defendants, expenses were "incurred" for NPC purposes when they were "jibbed."  The defendants also argued the expenses were properly included in the 2007 accounting because the NPC envisioned a cumulative accounting which included all expenses from inception of the NPI forward.

[¶38]  The district court issued a detailed order on the plaintiffs' motion to enforce.  It reviewed the evidence and rulings from the trial and the evidence about the pre-2007 expenses produced in the post-judgment proceedings, interpreted its earlier judgment and the relevant provisions of the NPC and ruled that all expenses which were invoiced before January 1, 2007 were excluded from the post-trial accounting.  In general, the district court agreed with the plaintiffs that the trial NPI determination was a full accounting of the NPI through December 31, 2006.  The district court also found that an expense was "incurred" under the NPC when it was invoiced.  Applying this definition, the district court decided that Section 3 of the NPC required the operators to charge expenses to the NPI account within one month after the close of the calendar month in which the invoice was dated.  Thus, the district court's decision relies upon two legal

17

concepts—the finality of the trial judgment and the tardiness of the defendants' expense reporting.

[¶39]  The trial judgment specifically stated net profits were awarded to the plaintiffs for the period of March through December 2006.  In its order on the motion to enforce, the district court entered the following findings of fact and conclusions of law regarding the scope of the trial judgment:

> [Findings of Fact] 25.       Ultra and SWEPI did not follow the NPC terms in reporting trial NPI expenses.  The individuals responsible for revenue and expense reporting testified they were not familiar with, or guided by, the NPC terms when they assembled and reported expense and revenue information to the Plaintiffs for the 2007 trial.
>
> 26.     Witnesses for Ultra and SWEPI testified they reported all NPI expenses for the trial calculation.  SWEPI witness, Jeannine Nieder, testified she instructed their experts to include all accumulator accounts in the trial expenses, including non-NPI wells, because she would rather include them and have them challenged rather than exclude them and lose some costs.
> . . . .
> [Conclusions of Law] 2.     Defendants were solely responsible for the NPI expenses reported for the 2007 trial calculation.  To the extent Defendants incurred but failed to properly present evidence of pre-2007 expenses at trial, they are precluded by the Judgment from doing so in the NPI accounting beginning January, 2007.

[¶40] The district court specifically excluded the expenses in the accrual and accumulator accounts from the NPI accounting approved at trial and the defendants did not appeal that decision.  We discussed the preclusive effect of a party's failure to appeal a decision in *Triton Coal Co. v. Husman, Inc.,* 846 P.2d 664, 667-68 (Wyo. 1993) and noted that, while the legal concept that a non-appealed issue is final may be part of the law of the case doctrine, it is more correctly classified as a type of waiver:

> Under the "law of the case" doctrine, a court's decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation. 1B JAMES W. MOORE, JO DESHA LUCAS & THOMAS S. CURRIER, MOORE'S FEDERAL PRACTICE ¶ 0.404[1] (2d ed. 1983). The "law of the case" is a doctrine

18

designed to avoid repetitious litigation and to promote consistent decision making. As such, it is in the same family as res judicata, collateral estoppel, and stare decisis. In their treatise, Professors Wright, Miller, and Cooper identify four situations in which the "law of the case" may arise. 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478 (1981). Most commonly, the "law of the case" requires a trial court to adhere to its own prior rulings, adhere to the rulings of an appellate court, or adhere to another judge's rulings in the same case or a closely related case. *Id.* Triton, however, relies upon a fourth and much less utilized aspect of the rule in which a court's ruling on an issue that could have been appealed, but was not, will be given preclusive effect. *Tom Beuchler Construction, Inc. v. City of Williston,* 413 N.W.2d 336, 339 (N.D.1987). Although some courts label this fourth category as the "law of the case," it is something of a misfit. Generally, the "law of the case" arises because a court has ruled on a matter and that ruling is to be applied to subsequent proceedings in the litigation. However, in the fourth category relied upon by Triton, it is the litigant's failure to raise an issue on appeal which gives rise to the preclusive effect of the lower court's ruling, not a court ruling. Allan D. Vestal, *Law of the Case: Single–Suit Preclusion,* 11 UTAH L.REV. 1 (1967). The underlying rationale of the fourth category of the "law of the case" is that a litigant can argue to an appellate court only those issues which he raised on appeal. *Id.* at 21. The idea that a litigant is limited to arguing those issues he raised on appeal is, in essence, the concept of waiver.

The general rule concerning waiver is:

[Q]uestions assigned as error are deemed to have been abandoned or waived where they are not urged or discussed on appeal by brief or argument, or are not sufficiently so discussed; and the same rule applies to cross errors. 5B C.J.S. *Appeal and Error* § 1803 at 98 (1958). This Court has consistently applied this long-standing rule in prior cases. *Dworkin v. L.F.P., Inc.,* 839 P.2d 903 (Wyo.1992); *Schaffer v. Standard Timber Company,* 79 Wyo. 137, 331 P.2d 611 (1958).

Applying the waiver concept in the case at bar, the defendants waived any objection to the district court's determination that the accrual and accumulator accounts could not be included in the trial net profit calculation because they did not appeal that aspect of the decision.

[¶41] With regard to the completeness of the trial accounting, the district court stated the witnesses for Ultra and SWEPI testified they reported all NPI expenses for the trial calculation. These findings are supported by the record. Jeannine Nieder, Shell's financial representative for its Rocky Mountain assets, testified she was responsible for gathering information about the NPI for the 2007 trial calculation and admitted she did not use the NPC to guide her in determining what expenses to include. She repeatedly stated that she "included all expense items" up through December 31, 2006, for the NPI calculation. The accumulator accounts prepared under her direction included expenses that she believed were at least partially allocable to NPI wells and leases, but, at the time of trial, she was not sure.

[¶42] After the trial, SWEPI started compiling information to meet its NPC reporting requirements. The March 2007 expenses reported by SWEPI were unusually high, including $43 million of pre-2007 expenses. Contrary to SWEPI's representation of the nature of the accumulator account expenses at trial, the district court found in the post-judgment order that at least some of the expenses could have been allocated to the NPI wells prior to trial:

> 18. SWEPI disclosed its March, 2007 expenses were abnormally high because $43 million in pre-2007 expenses from the accumulator account was charged to NPI wells in March, 2007. SWEPI charged certain of the accumulator expenses to NPI wells prior to trial but did not report the accumulator expenses as incurred expenses. SWEPI records reflect the accumulator expenses were invoiced prior to January 1, 2007.

The defendants do not establish this factual finding was clearly erroneous.

[¶43] At the hearing on the motion to enforce, Ms. Nieder testified about the process SWEPI used in early 2007 to move the pre-2007 expenses from the accumulator accounts to the NPI account. She was questioned as to why the amounts in the accumulator accounts invoiced prior to December 31, 2006, had not been reported as incurred NPI expenses for the October 2007 trial. Ms. Nieder stated SWEPI had not finished its NPI accounting so, even though the expenses could have been charged to NPI wells prior to trial, they were just put in an accumulator account.

20

[¶44] Kristen Marron, Ultra's controller until April 2007, testified at her June 2007 deposition that she had been instructed to compile all accounting data for the relevant leases. She stated that she had provided all revenue and expense information "as requested." Ms. Marron testified the trial data included all costs to "drill and complete the wells," lease operating expenses, and the G & A (general and administrative costs) allocation. She stated the only expenses excluded were those that did not pertain to the relevant wells. Mr. Johnson later testified that he had understood from Ms. Marron's deposition in June 2007 that "all expenses were provided."

[¶45] As the district court noted, the trial accounting was meant to be final through December 2006. Given the defendants were the only parties with access to the expense information and the parties understood the trial accounting was final through December 2006, the defendants should have provided all expenses applicable to the NPI leases through the end of 2006 for determination of the NPI at trial. A reasonable inference from the evidence presented at the post-judgment hearing is that the defendants simply failed to perform their accounting obligations and did not properly identify and report all of the pre-2007 expenses for trial. Having failed to report the expenses for trial, the defendants sought to include them in a later accounting period without regard for the finality of the pre-2007 accounting or the trial judgment.[9] The district court's findings as to the scope of the trial accounting are supported by the record. It properly concluded that all expenses deductible from the NPI calculation for 2006 should have been included in the defendants' trial evidence.

[¶46] The defendants argue that since the expenses were not allowed at the trial, they should be allowed in the post-trial NPI calculations. This argument requires us to assume the excluded accrual and accumulator accounts were the same pre-2007 expenses they now seek to include in the 2007 accounting. The defendants did not make a clear connection between the trial accrual accounts and the pre-2007 expenses they sought to include in the 2007 accounting at the post-judgment hearings. The most obvious difference is the amounts did not match. The excluded trial expenses included $77.7 million in Ultra's accrual accounts and $59.2 million in SWEPI accumulator accounts, while the expenses at issue in the post-trial accounting with activity dates before January 1, 2007, included $60.8 million for Ultra and $70.5 million for SWEPI.

[¶47] During the post-judgment proceedings, Ultra's controller Garland Shaw[10] was asked about the relationship between the $77.7 million in Ultra's accrual account that was

---

[9] Furthermore, some of the pre-2007 expenses claimed by Shell in its 2007 NPI accounting did not even pertain to NPI wells, even though they had supposedly been confirmed as expenses allocable to the NPI in the post-trial accounting process.

[10] Mr. Shaw testified that he started as Ultra's corporate controller in October 2006. Apparently there was some overlap between Mr. Shaw's and Ms. Marron's tenures, as she testified that she was Ultra's controller until March 2007.

excluded from the trial accounting and the $60.8 million of pre-2007 expenses that Ultra was seeking to deduct from the post-trial NPI calculation. He confirmed there was no direct correlation between the amounts and stated, "we're sort of talking about apples and oranges when we talk about the 60 million and we talk about the 77 million." When asked whether Ultra could have tied the pre-2007 expenses currently in dispute to the accruals excluded at trial, Mr. Shaw stated they "could have made a determination" but they did not because "[t]here's no reason to do that. The accruals were disallowed at trial." The amounts in the trial accrual accounts were not supported by source documents, which would have shown detail such as the activity date, invoice date or payment date. Therefore, the defendants' current argument that it was wrong to exclude the former accrual expenses from the post-trial accounting after they had been excluded at trial is not supported by the record because there was no evidence the trial accrual expenses were the same as the pre-2007 expenses the defendants wish to include in the 2007 accounting.

[¶48] The district court also relied upon the terms of the NPC in excluding from the 2007 NPI accounting expenses that were incurred prior to December 31, 2006. To reiterate, Paragraph 98 of the judgment states:

> The defendants remain obligated to and shall perform the required NPI accounting on a consolidated basis and make payments monthly to the plaintiffs commencing with production month January 2007, and shall do so in accordance with the terms of the Net Profits Contract and its Accounting Procedure.

[¶49] The contractual provision establishing the deadline for the operators to report expenses to the net profit owners is located in Section 3 of the NPC and states:

> Within one (1) month after the close of each calendar month, Operator shall furnish to Novi a statement of costs and expenses incurred and charges made and all receipts and credits received during such calendar month.

Under this provision and others in the contract, the proper time for charging an expense to the NPI is when it is "incurred" by the operator.

[¶50] The plaintiffs argued, and the district court agreed, an expense is incurred under the contract when a third party provides an invoice for goods or services related to the NPI leases to the operator. The defendants argued, however, that a cost is incurred for NPC purposes when it was billed to the joint interest partners in a JIB or, in other words, "jibbed." We apply our typical rules of contract interpretation to this issue.

22

The initial question of whether the contract is capable of being understood in only one way is a question of law for the court. If the court determines that the contract is capable of being understood in only one way, then the language used in the contract expresses and controls the intent of the parties. In such case, the next question, what is that understanding or meaning, is also a question of law. . . .

*M & M Auto Outlet v. Hill Inv. Corp.,* 2010 WY 56, ¶ 12, 230 P.3d 1099, 1104 (Wyo.2010), quoting *Examination Mgmt. Servs., Inc. v. Kirschbaum,* 927 P.2d 686, 689 (Wyo.1996) (internal citations omitted).

*Davidson Land Co. v. Davidson,* 2011 WY 29, ¶ 13, 247 P.3d 67, 71 (Wyo. 2011).

[¶51] To determine the meaning of contract terms, we focus on the parties' intent. When the language is clear and unambiguous, we determine that intent from the contract language. We give the words used in the contract their plain and ordinary meaning and consider the agreement as a whole, giving effect to each provision. *Davidson,* ¶¶ 14, 34, 247 P.3d at 71, 76; *Hall v. Perry,* 2009 WY 83, ¶ 13, 211 P.3d 489, 494 (Wyo. 2009). We resort to rules of contract construction only when a contract is ambiguous. *Davidson,* ¶ 14, 247 P.3d at 71. *See also Christensen v. Christensen,* 2008 WY 10, ¶ 13, 176 P.3d 626, 629 (Wyo. 2008); *Cathcart v. State Farm Mut. Auto. Ins. Co.,* 2005 WY 154, ¶ 18, 123 P.3d 579, 587 (Wyo. 2005).

[¶52] The deadline for the timely reporting of expenses by the operators to the net profit owners is triggered when the operator incurs an expense. The plain and ordinary meaning of "incur" is: "to become liable or subject to: bring down upon oneself <incur expenses>" Merriam-Webster Dictionary 250 (2005). *See also Fix v. Forelle,* 2014 WY 79, ¶ 17, 327 P.3d 745, 749 (Wyo. 2014) (defining incur with dictionary definition). The usual understanding of when a party becomes liable or subject to an actual expense is when a third party vendor or service provider gives notice of the amount charged and when payment is due. That information is commonly communicated with an invoice or a bill.

[¶53] The district court accepted the common usage when it rejected the defendants' position that an expense is incurred when it is "jibbed" and, instead, adopted the plaintiffs' argument that the invoice date is the date of incurrence:

> 21. The appropriate date for when an expense is incurred for purposes of the NPI accounting is the date of an invoice for work or material provided on a NPI well or lease. The invoice date provides an operator with the date of a

23

charge by a third party for work performed or materials furnished for a NPI well. The invoice also provides the operator with a sum to be paid and the date payment is due.

28. The NPC does not contemplate expense reporting based on the operators' discretionary internal accounting process after an invoice has been received, after it has been approved for payment, and when it is reflected on a joint interest billing to the working interest owners in a NPI well. Such a procedure could result in posting an expense to the NPI account several months after the expense was incurred.

The district court explained that adopting the invoice date as the date of incurrence is consistent with the contract language and is "a workable standard. Utilizing the invoice date reduces uncertainty and further reduces the opportunity for manipulation of the NPI account as to the timing of charges to the NPI account."

[¶54] The defendants assert the district court's interpretation of the contract language ignores other provisions of the NPC including the provisions referencing expenses that are "reasonable and customary" and "properly chargeable against the leasehold interest" in Section 2 of the contract and the cumulative nature of the NPC accounting set out in Section 3. The "reasonable and customary" and "properly chargeable" language is part of the definition of expenses in Section 2. It describes the scope of the expenses to be included in the NPI calculation and does not address the timing of the reporting requirement. The deadline for reporting expenses is set out in the "incurred" language of Section 3. The defendants are correct that Section 3 of the NPC requires calculation of the net profits on the basis of cumulative revenues and expenses over the life of the contract. That does not mean, however, the defendants were free to disregard the timing provisions of the contract. The contract requires the operators to report the expenses to the net profit interest owners within one month after the month an expense is invoiced.

[¶55] The district court's interpretation that the defendants are obligated to charge expenses to the NPI within the NPC's deadline gives full effect to all of the terms of the contract and accurately reflects the rulings from the trial judgment. The defendants would have received the benefit of the cumulative accounting for expenses had they reported them to the plaintiffs within the contract timeline. As the district court recognized, if the operators can decide when a cost is incurred by picking the time to include it on the JIB, the net profit interest, which is payable in any month that shows a net profit, would be subject to manipulation and the reporting deadlines would essentially be meaningless. There would be no reason for the contract to require the operators to report on a monthly basis if they can decide when to apply the expenses using the JIB process.

24

[¶56] The district court also properly considered the circumstances surrounding the execution of the NPC in 1954 in determining that the original parties did not intend to use the JIB date as the date of incurrence. As we have stated before, even when a contract is unambiguous, evidence of the circumstances surrounding its execution may be considered to determine the parties' intent. "Relevant considerations may include the relationship of the parties, the subject matter of the contract, and the parties' purpose in making the contract." *Davidson,* ¶ 14, 247 P.3d at 72, quoting *Ecosystem Res., L.C. v. Broadbent Land & Res., L.L.C.,* 2007 WY 87, ¶ 10, 158 P.3d 685, 688 (Wyo. 2007). The district court explained:

> 29. At the time the NPC was negotiated and executed, El Paso was the original operator of the subject properties. Continental and MALCO were non-operating working interest owners. Had the parties intended to provide that an expense is incurred for the NPI accounting based on when the operator decided to charge the joint interest owners, they could have done so, but they did not.

In other words, the contracting parties were familiar with the JIB process but did not expressly incorporate that accounting time into the NPC terms. Instead, the original parties adopted a reporting deadline based upon when the operator incurs an expense, i.e., when an expense is invoiced, thereby making the recipient liable for the amount due.

[¶57] The arbitrariness of using the JIB date as the date of incurrence was aptly demonstrated in Ms. Nieder's testimony about Shell's method of expense reporting. She actually agreed with plaintiffs' counsel at the March 2013 hearing that when Shell received an invoice it had incurred an expense. However, she testified Shell's charge against the NPI did not follow the "incurrence" language.

> Q. . . . So your classification of inclusion in the net profits is something other than an incurrence of an expense? Are we to understand that?
>
> A. That's correct.

Ms. Neider stated that her understanding of the NPC was that a charge is "billable to the NPI when that charge is posted to a well associated with the NPI," as part of the JIB process. She confirmed that the operator was in charge of posting the expenses and stated the following with regard to the timing of the posting:

> Q. [I]s it typical that the posting happens in the month following the expense being incurred?

25

A. It could happen in the month following. It could happen subsequent to that.

Q. So whatever time that is, a month, two months, three months, it's your opinion, what you're offering as opinion is that's when it gets charged to the net profits account?

A. Yes.

Ultra's financial witness, Mr. Shaw, also admitted that "[a]ccording to the true definition of what is incurred," an expense is incurred when invoiced.

[¶58] Notwithstanding the plain meaning of the contract language, Ultra and SWEPI assert that the plaintiffs agreed to use the JIB date as the date to charge expenses to the net profits account, the district court confirmed that agreement, and the plaintiffs should, therefore, be bound under the principles of judicial estoppel, collateral estoppel and/or the law of the case. Application of these principles are matters of law; consequently, our review is *de novo*. *Tarver v. City of Sheridan Bd. of Adjustments,* 2014 WY 71, ¶¶ 10-11, 327 P.3d 76, 80 (Wyo. 2014). We provided a comprehensive definition of judicial estoppel in *Bredthauer v. TSP,* 864 P.2d 442, 445 (Wyo. 1993) as:

> a doctrine which estops a party to play fast and loose with the courts or to trifle with judicial proceedings. It is an expression of the maxim that one cannot blow hot and cold in the same breath. A party will just not be allowed to maintain inconsistent positions in judicial proceedings * * *.

> *Allen [v. Allen],* 550 P.2d [1137], 1142 [(Wyo. 1976)]. In [*Matter of Paternity of*] *JRW,* [814 P.2d 256 (Wyo. 1991)] we stated that under the doctrine of judicial estoppel:

>> "[A] party who by his pleadings, statements or contentions, under oath, has assumed a particular position in a judicial proceeding is estopped to assume an inconsistent position in a subsequent action."

> *JRW,* 814 P.2d at 1265–66 (*quoting* Black's Law Dictionary 761 (5th ed. 1979)).

[¶59] As we mentioned earlier, the law of the case doctrine guards the consistency of judicial decisions and states that "a court's decision on an issue of law at one stage of a

26

proceeding is binding in successive stages of the litigation." *Lieberman v. Mossbrook,* 2009 WY 65, ¶ 28, 208 P.3d 1296, 1305 (Wyo. 2009), citing *Triton,* 846 P.2d at 667. Similarly, collateral estoppel is a preclusion doctrine that bars the relitigation of previously litigated issues. *Tarver,* ¶¶ 10-11, 327 P.3d at 80.

[¶60]  The defendants direct us to two instances they say demonstrate the plaintiffs and district court adopted the JIB date as the date of incurrence.  The first is a November 23, 2010, letter from plaintiffs' counsel to defendants' counsel complaining about the operators' failure to provide complete accounting information.  The letter began: "We are near the end of 2010 and the companies responsible for accounting for the [NPI] have not completed the accounting for 2007-2008."  To move the accounting process forward, the plaintiffs attached a one-page proposed procedure for NPI reporting.   The proposal contained a broad outline of what information should be included in monthly revenue and expense reports.  It also provided that each company would designate a representative to act as a contact for the plaintiffs to obtain additional information.  The basic NPI revenue information identified in the proposal included well identification, volumes of oil and gas produced and gross revenues.  Their proposal for NPI expense information was even less detailed, stating only: "Lease Operating Expenses and capital expenditures charged to joint account <u>by operators</u> on Joint Interest Bills on NP wells."  (Emphasis in original).

[¶61]  The district court rejected the defendants' claim that the letter amounted to an agreement to use the JIB date as the date of incurrence, and its finding is supported by the record.  The November 2010 proposal included only general outlines of the information that should be included in the monthly reporting.   It specifically noted that other resources should be made available to the plaintiffs as part of the accounting process, including source documents and a contact person at each company so the plaintiffs could request additional information.  When questioned about the effect of the November 2010 proposal, the plaintiffs' expert testified that the reference to the JIB expenses did not pertain to the timing of the expense reporting but rather what expenses should be included in the reports.  In a later letter dated February 8, 2011, plaintiffs' counsel stated that, under the NPC, the defendants were obligated to report expenses "within 30 days after the calendar month when they are incurred."  Clearly, the 2010 proposed accounting procedure was not an express adoption by the plaintiffs of the JIB date as the date of incurrence for NPC expense reporting.

[¶62]  The second piece of evidence the defendants assert shows the plaintiffs and district court adopted the JIB date as the date of incurrence is the NPI reporting statement, which was stipulated to by the plaintiffs and approved by the district court.  The NPI reporting statement was actually a series of seven forms showing various expense and revenue summaries about the NPI wells on a monthly basis.

[¶63]  The record does not support the defendants' claim that the plaintiffs and district court adopted the JIB date as the date of incurrence when the NPI reporting statement

was agreed upon and approved. Two of the forms included in the approved statement refer to the JIB dates, but the other five do not. The approved monthly statement includes only general summaries of expenses and revenues. The defendants are also providing source documents to the plaintiffs, which include other details about the expenses like the invoice dates. Although the information about when expenses were jibbed presumably assists the parties in tracking the expenses, the statement contains no express adoption of the JIB date as the date expenses are incurred under the NPC. The defendants do not direct us to any evidence in the record showing that the parties intended to change the plain meaning of the contract language by adopting the NPI reporting statement. Furthermore, the district court's order approving the NPI statement says nothing about when costs are incurred for purposes of the NPC reporting deadline.

[¶64] Without a more definitive statement that the parties and the court intended to rely on the JIB date as the date of incurrence, we certainly cannot say the district court's decision that no such agreement existed was clearly erroneous. Given there was no agreement or order requiring use of the JIB date as the date of incurrence under the NPC, the preclusion and equitable doctrines of judicial estoppel, collateral estoppel, and/or law of the case do not apply.

[¶65] Finally, the defendants claim the district court's order creates an improper forfeiture and the exclusion of the expenses is unfair and inequitable. Their forfeiture argument is misplaced. The law does not favor forfeiture of contract rights, *see, e.g., Reynolds v. Milatzo,* 2007 WY 104, ¶ 15, 161 P.3d 509, 513 (Wyo. 2007); however, this case does not involve a true forfeiture of contract rights. Instead, we are concerned with concepts of judgment finality and interpretation of the scope of the judgment and the terms of the NPC help guide that interpretation. The defendants had a fair opportunity to present their expenses at trial and either did not do so or mischaracterized the nature of the expenses.

[¶66] The defendants also argue that the district court's order will result in a forfeiture of any future (or post-2006) expenses which are not reported within the time limits of the NPC. We do not read the order that way and neither do the plaintiffs. The court did not make any express ruling on what remedies would be proper for future violations of the contract reporting requirements. The plaintiffs state in their brief:

> [Ultra] complains that under the Judgment, if defendants do not charge an expense in the first report following the month in which the expense is incurred, it is forever forfeited. The Order Regarding Pre-2007 Expenses does not compel that result. Defendants would be entitled to normal adjustments of the NPI account for the period beginning January 2007, for these accounts are not subject to the finality of a Judgment.

28

They reiterated this position at oral argument. The plaintiffs properly recognize that the order at issue in this case was based upon the dual considerations of finality of the trial judgment and interpretation of the terms of the NPC.

[¶67] The defendants' argument that the district court's decision was unfair and inequitable also rings hollow for other reasons. There were actually $131 million in expenses at issue in the post-judgment proceedings. The district court carefully considered the expenses using the December 31, 2006, invoice date as the cutoff. It disallowed approximately $102 million in expenses, but allowed expenses of approximately $29 million that were invoiced later. The district court's thorough review of the proposed expenses supports its decision and undermines the defendants' fairness arguments.

[¶68] Furthermore, although the plaintiffs and the district court were led to believe at trial that Ultra's accrual accounts contained only estimates, the post-trial information showed that the majority of the expenses had actually been invoiced and, in many instances, paid prior to December 31, 2006. In fact, some of the pre-2007 expenses the defendants wanted to include in the 2007 accounting had been invoiced and paid several years before. If the trial accrual amounts had truly been field estimates, the actual amounts would have been invoiced later and would have been proper 2007 deductions.

[¶69] The defendants persistently argue that interpreting the NPC to require them to report expenses in the month after they are invoiced imposes an unduly heavy burden upon them. They insist it is easier to report to the NPI owners at the same time they bill their joint interest partners. Perhaps that is true; however, that is not what the NPC requires.[11] We are not at liberty to amend or modify a contract under the guise of interpretation. *Fayard v. Design Committee of the Homestead Subdivision,* 2010 WY 51, ¶ 18, 230 P.3d 299, 304 (Wyo. 2010), citing *Brumbaugh v. Mikelson Land Co.,* 2008 WY 66, ¶ 28, 185 P.3d 695, 704 (Wyo. 2008). Additionally, we note that oil and gas leaseholders and operators are subject to different reporting and payment deadlines under

---

[11] Although the parties do not address this development, we note that they agreed in a February 25, 2013, document entitled, "Stipulation Concerning Remaining Post-Judgment Issues and March 5-6, 2013 Hearing" as follows:

> 2. Operator Defendants shall continue to provide the information concerning the Novi account that was ordered by the Court in its "Order Approving Monthly Net Profits Reporting Forms" dated December 17, 2012.

> 3. Plaintiffs have raised issues regarding the [Operator] Defendants' alleged non compliance with the timing of the monthly NPI report as provided in Section 3 of the [NPC]. [Operator] Defendants agree that, beginning with production month February 2013, the Defendants will provide Plaintiffs with the approved monthly reporting form and supporting documents within ninety (90) days from the last of the production month. For instance, the monthly NPI report for February 2013 production month, March 2013 NPI month, would be due on or before May 31, 2013.

various statutes and contracts, including federal mineral royalties, state severance taxes, the WRPA, joint interest billing, etc. The NPC simply imposed an additional reporting requirement upon the operators. There is nothing inherently unfair or unconscionable about that. The district court aptly addressed the defendants' argument:

> A consistent theme from the Defendants with respect to the accounting requirements of the net profits interest is the requirements are impractical and difficult to comply with given their current business practices. The Court observes the Defendants have made enormous profits from operations on the leases subject to the net profits interest. Their obligation is to conform their accounting procedures to accommodate their contractual and Court ordered obligations under the provisions of the net profits contract not the net profits contract to their accounting procedures and business practices.

[¶70] This statement by the district court also applies to another equitable argument propounded by the defendants. They emphasize the large amount of money invested in the leases for which they did not receive credit and argue the plaintiffs received a windfall of approximately $102 million. That is, of course, an enormous amount of money. However, the defendants' argument disregards the context. The amount of money changing hands as a result of the NPI leases is almost unfathomable. At the trial, the court was considering total expenses of over $2 billion and even greater revenues. *Ultra I,* ¶ 16, 226 P.3d at 904. The parties indicate those amounts have grown considerably in the ensuing years. The $102 million in expenses is but a small fraction of the totals. Also, it is important to keep in mind that the NPI is concerned with slightly less than five percent of the total revenues and expenses, so the actual amount which the defendants lost in deductions was only approximately $5 million out of the more than $2 billion total trial expenses. *Ultra I,* ¶ 11, 226 P.3d at 902-03. Finally, the defendants should keep in mind that without the original assignment of the leases by the plaintiffs' predecessors in exchange for the net profit interest, they would not have acquired the leases in the first place. *Id.,* ¶ 3, 226 P.3d at 899. The defendants simply have not convinced this Court that the result in this case is inequitable or unfair.

### 3. **Attorney Fees**

[¶71] Wyoming follows the American rule on attorney fees which states that each party is responsible for its own attorney fees unless there is express contractual or statutory authority for an award of fees. *Ultra I,* ¶ 151, 226 P.3d at 936; *Stafford v. JHL, Inc.,* 2008 WY 128, ¶ 16, 194 P.3d 315, 318 (Wyo. 2008). The remedy provisions of the WRPA are broad and provide:

(a) Any lessee or operator, purchaser or other party legally responsible for payment who violates the provisions of this article is liable to the person or persons legally entitled to proceeds from production for the unpaid amount of such proceeds, plus interest at the rate of eighteen percent (18%) per annum on the unpaid principal balance from the due date specified in W.S. 30-5-301(a).

(b) The district court for the county in which a well producing oil, gas or related hydrocarbons is located has jurisdiction over all proceedings brought pursuant to this article and the prevailing party in any proceedings brought pursuant to this article shall be entitled to recover all court costs and reasonable attorney's fees.

(c) Any person who fails to provide royalty information as provided in W.S. 30-5-305(b) is liable to the affected royalty, overriding royalty or other nonworking interest owner in the amount of one hundred dollars ($100.00) per month that complete reporting is not provided to the interest owner.

Wyo. Stat. Ann. § 30-5-303 (LexisNexis 2013).

[¶72] The defendants argue the district court's order awarding attorney fees to the plaintiffs was erroneous. Their first argument depends upon a reversal by this Court of the district court's rulings on jurisdiction or its interpretation of the NPC. In that event, the defendants maintain, they would be the prevailing parties and, consequently, entitled to an award of attorney fees. Given we have affirmed the district court's rulings on those issues, the defendants are not entitled to an attorney fees award.

[¶73] The defendants also claim that even if the plaintiffs were entitled to an attorney fees award, the district court erred by allowing the plaintiffs' entire request. We review a district court's attorney fees award for abuse of discretion.

A court abuses its discretion only when it acts in a manner which exceeds the bounds of reason under the circumstances. The burden is placed upon the party who is attacking the trial court's ruling to establish an abuse of discretion, and the ultimate issue is whether the court could reasonably conclude as it did.

We have said that "[j]udicial discretion is a composite of many things, among which are conclusions drawn from

31

> objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." If the record includes sufficient evidence to support the district court's exercise of discretion, we uphold its decision.
>
> [*Mueller v. Zimmer,* 2007 WY 195, ¶ 11, 173 P.3d 361, 364 (Wyo. 2007)]*,* quoting *Hayzlett v. Hayzlett,* 2007 WY 147, ¶ 7, 167 P.3d 639, 641–42 (Wyo.2007) (internal citations omitted).

*Ultra I,* ¶ 149, 226 P.3d at 935.

[¶74]  The defendants assert the district court abused its discretion by failing to require the plaintiffs to segregate their fees between the WRPA claims they prevailed upon and other claims.  In the post-judgment proceedings, the plaintiffs initially requested the district court award them fees of $1,177,305.50.  The defendants evaluated the plaintiffs' attorney fees submission and determined that only 641.9 hours, valued at $189,620, were properly awardable to the plaintiffs under the WRPA.  The district court did not require the plaintiffs to segregate the fees and awarded the plaintiffs their full attorney fees request.

[¶75]  In general, "[s]egregation of fees between multiple clients and/or multiple claims is required when it is possible." *Cline v. Rocky Mountain, Inc.,* 998 P.2d 946, 952 (Wyo. 2000).  However, we explained in *Ultra I,* ¶¶ 153, 226 P.3d at 936:

> Section 30–5–303(b) provides that the prevailing party "in any proceedings brought pursuant to this article" is entitled to a fee award. The plain meaning of the term "proceedings" is broad, especially when phrased in the plural. *Black's Law Dictionary* 1324 (9th ed.2009) defines "proceeding" as "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment. Similarly, *Webster's Third New Int'l Dictionary* 1807 (2002) defines "proceeding" in the context of law as "[l]egal action; litigation."

In *Ultra I,* ¶ 157, 266 P.3d at 937, we rejected the defendants' claim that the plaintiffs were entitled to fees only for the discrete WRPA claims.  We concluded that many of the claims for which the defendants sought segregation were inextricably intertwined with their WRPA claims.  *Id.,* citing *City of Gillette v. Hladky Constr., Inc.,* 2008 WY 134, ¶ 110, 196 P.3d 184, 212 (Wyo. 2008).

[¶76] Ultra asserts the plaintiffs were only entitled to fees associated with two post-judgment issues, the pre-2007 expenses and division expenses. According to Ultra, fees should not have been allowed for the plaintiffs' abandoned or unsuccessful efforts to: obtain broader access to the defendants' accounting documents; obtain access to documents from a former defendant who ultimately settled; obtain a determination of the fair market value of SWEPI's gas because that issue was not finally decided; and enforce the Supplemental Accounting Agreement.

[¶77] Diverging from Ultra on this issue, SWEPI argues the plaintiffs were entitled to an award against it only as to the pre-2007 expense issue because SWEPI never tried to include division expenses in its post-trial NPI calculations. SWEPI also claims the district court abused its discretion by failing to exclude from the award fees pertaining to general investigation, evaluation of monthly NPI reports, and entries related to correspondence with non-parties, including those with whom the plaintiffs settled.

[¶78] The district court ruled the WRPA applied to the post-judgment proceedings, the plaintiffs were the prevailing parties, and they were entitled to an award of reasonable attorney fees and costs. The district court rejected the defendants' argument that the plaintiffs were required to segregate their fees related to the discrete WRPA issues, explaining:

> The Court believes defendants have misapprehended the language of the WRPA and misapplied the obligation to segregate fees and expenses among defendants and/or claims. The Court agrees with plaintiffs['] characterization of the proceedings related to their motion, specifically that all issues (i.e. claims) in the current matter before the Court, and on appeal,[12] relate to a common nexus, a common cause, that being to enforce their judgment and the requirement that the defendants properly account for and pay the net profits interest pursuant to the Court's judgment and the Net Profits Contract. In this endeavor, they were the prevailing party in that they improved their position markedly in terms of the accounting procedures and reporting requirements and in the proper calculation of the amount ultimately due. In this respect the Court agrees with the language from *Hensley v. Eckerhart,* 461 U.S. 425, 435 (1982) cited in support of a comprehensive fee award.

---

[12] This reference to issues "on appeal" recognizes that the district court's attorney fee decision was entered after the defendants had already appealed the decision on the merits. The district court had continuing jurisdiction, after the defendants appealed its order on the merits, to consider and award attorney fees. W.R.C.P. 58; *Shindell v. Shindell,* 2014 WY 51, ¶ 28, n.2, 322 P.3d 1270, 1277, n.2 (Wyo. 2014).

"Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."

(footnote added).

[¶79] The district court also stated that, although the post-judgment proceedings were not as long or complicated as the original trial, the proceedings were comparable and noted that this Court approved its $3.9 million attorney fee award in the first action. It compared the affidavits submitted by the parties as to the reasonableness of the plaintiffs' attorney fees submission and stated that, applying the lodestar factors,[13] the $1,177,305 requested for the post judgment proceedings was "reasonable and appropriate in view of the nature, complexity and extent of the entire litigation undertaken by plaintiffs in support of their efforts to enforce their judgment."

[¶80] The WRPA specifically addresses the requirements for reporting to oil and gas interest owners and provides remedies for reporting failures, including attorney fees to prevailing parties. Wyo. Stat. Ann. §§ 30-5-303 & 305. The defendants did not properly report to the plaintiffs at the beginning of the post-judgment period. The NPC report provided by the defendants on July 23, 2010, was a simple two-page High Level Summary. After the plaintiffs filed their motion to enforce, the defendants began to provide more information and the parties were eventually able to agree on a set of reporting forms. This agreement satisfied some of the issues in the post-judgment proceedings, although the plaintiffs continued to question whether the defendants were properly applying the NPC accounting formula with regard to certain expenses.

[¶81] Given the post-judgment issues focused on the defendants' responsibilities under the WRPA, the NPC and the judgment based upon the act and the contract, the district court's refusal to require segregation of fees between WRPA and non-WRPA claims in the post-judgment proceedings was consistent with our decision in *Ultra I*. For example, the plaintiffs' efforts to obtain information about the NPI accounting and their evaluation

---

[13] The lodestar test requires a determination of whether: "1) the fee charged represents the product of reasonable hours times a reasonable rate; and 2) other factors of discretionary application should be considered to adjust the fee upward or downward." *Ultra I,* ¶ 162, 266 P.3d at 938. *See* Wyo. Stat. Ann. § 1–14–126(b) (listing factors considered in awarding attorney fees).

of that information were certainly intertwined with enforcing the contract and the defendants' on-going reporting and payment obligations and clearly fell within the parameters of the WRPA. Other matters, including correspondence with non-parties, etc. are not so readily characterized as WRPA litigation. However, "[t]he burden is placed upon the party who is attacking the district court's ruling to establish an abuse of discretion, and the ultimate issue is whether the court could reasonably conclude as it did." *Joe's Concrete & Lumber, Inc. v. Concrete Works of Colorado, Inc.,* 2011 WY 74, ¶ 12, 252 P.3d 445, 448 (Wyo. 2011). The defendants have not satisfied that burden. Instead, they simply list examples of items they claim should not have been approved in the attorney fees award and refer us to their district court filings. In most respects, the defendants' argument is insufficient to establish the district court abused its discretion.

[¶82] Nevertheless, we have determined the district court's attorney fees award should be modified in one regard. The plaintiffs stated, in their reply to the defendants' opposition to their fee request, that they did not contest a "reduction of fees associated with clerical and filing matters." The plaintiffs, therefore, revised their fee request by eliminating those fees, making their total request $1,153,430.50. Despite the plaintiffs' concession on the fees associated with clerical and filing activities, the district court awarded the plaintiffs their original request of $1,177,305.50. The district court should have acknowledged the plaintiffs' revision of their fees request and eliminated the associated fees. We, therefore, rule that the attorney fees award should be revised to reflect the plaintiffs' agreement and reduced to $1,153,430.50.

## CONCLUSION

[¶83] We conclude the district court properly assumed jurisdiction in this matter pursuant to its inherent court powers and the Declaratory Judgments Act. In addition, we conclude the district court's interpretation of the scope of the 2007 trial NPI determination is supported by the record and its interpretation of when expenses are "incurred" under the language of the NPC was correct. Finally, with one exception, the defendants have not demonstrated the district court abused its discretion in awarding the plaintiffs attorney fees.

[¶84] Affirmed, as revised.